Alton T. WEBSTER, Petitioner,

v.

DEPARTMENT OF the ARMY,
Respondent.

No. 89–3369.

United States Court of Appeals,
Federal Circuit.

Aug. 9, 1990.

Alton T. Webster, Fayetteville, N.C., pro se.

Randall J. Bramer, Dept. of Justice, Washington, D.C., for respondent.

Before NIES, Chief Judge,* and NEWMAN and MICHEL, Circuit Judges.

MICHEL, Circuit Judge.

The Merit Systems Protection Board (Board) sustained the removal of Alton Webster, a civilian postal clerk at an Army installation, finding an adequate basis therefor because of five incidents of "serious" misconduct involving insubordination, failure to follow his supervisor's instructions, open disrespect to his supervisor and to a military officer, and creating a disturbance. *Webster v. Department of Army*, Docket No. AT07528910316 (MSPB May 11, 1989). The initial decision became final on June 15, 1989, because Webster failed to file for review by the full Board; he then filed a timely appeal, *pro se*, under 5 U.S.C. § 7703(b)(1) (1988), over which we have jurisdiction under 28 U.S.C. § 1295(a)(9) (1988). Because the Administrative Judge (AJ) adequately considered all relevant *Douglas* factors as to alleged disproportionate penalty, properly applied correct legal standards and burdens in deciding the issue of alleged retaliation, and based his conclusions on findings supported by substantial evidence, we affirm.

## BACKGROUND

Webster was employed by the Department of the Army as a civilian mail clerk charged to assist military mail clerks and units at Fort Bragg with regulatory compliance and training. *Webster*, slip op. at 15. He was removed, effective December 30, 1988, based on eleven specifications, including incidents of insubordination, creating a disturbance resulting in an adverse effect on morale and maintenance of proper discipline, disrespect towards his supervisor (all second offenses), discourtesy, willful violation of rules and regulations, and willful use of a government vehicle for other than official business. *Id.* at 1–2. His removal

was recommended by his supervisor, Mr. Willie L. McCain, and ordered by Ms. Judith Bickford, who apparently was three levels above petitioner in the postal chain of command.

Webster appealed his removal to the Board. After a full evidentiary hearing on March 28, 1989, the AJ dismissed six specifications but sustained the following five, finding each supported by a preponderance of the evidence:

1. On September 13, 1988, Webster failed to report to his supervisor prior to turning in his government vehicle, contrary to his supervisor's express instructions. The other employees received the very same specific instruction, *i.e.*, to report daily to the supervisor at the postal branch, in person or by phone, prior to 1615 hours and before turning in their vehicles. Statements of Annie G. McLaughlin, Edgar Chapman and Willie L. McCain, *compiled in Webster*, Docket No. AT07528910316 (Tab 4K–4) [hereinafter *compiled in* Board Record]. It is undisputed that all but Webster complied. *Webster*, slip op. at 6–7. Despite repeated reminders from McCain, on this occasion Webster plainly did not obey. Notice of Proposed Removal, by Judith Bickford, Chief, Operations/Systems Integration Division (Oct. 19, 1988) [hereinafter Notice of Proposed Removal (Oct. 19, 1988)], *compiled in* Board Record (Tab 4J).

Webster argued as justification or excuse that he disagreed with the need to report to his supervisor, McCain, because, he said, "the policy did not make sense." *Webster*, slip op. at 7 (AJ Finding of Fact); Notice of Proposed Removal (Oct. 19, 1988) (Bickford quoting Webster's statement.). The AJ did not accept Webster's personal opinion about the lack of value of the instruction as a valid excuse. Webster's brief to us also argued that McCain had agreed to exempt him from compliance. He cited no testimony, however, in support of this contention. The AJ found the specification proven.

* Chief Judge Nies assumed the position of Chief Judge on June 27, 1990.

2. On September 15, two days later, Webster failed to assemble and remain in front of the post office during a fire drill as instructed and as all the other postal employees did; instead, immediately upon departing the building, he left the area. Both not assembling out front and departing the area were contrary to supervisor McCain's explicit instructions. The AJ found McCain "instructed all employees to assemble on the lawn in front of the [building]." *Webster*, slip op. at 7. McCain stated he instructed all personnel to "fall out on the grass in front of the Postal Branch...." Disposition Form, by Willie L. McCain, Chief, Postal/Distribution Branch (Sept. 21, 1988), *compiled in* Board Record (Tab 4K–4). Other employees stated they were instructed to "go outside to the field located between the Post Office and [the road]" and to "assemble outside on the grass." Statements of Warren P. Basnight and Peggy E. Worcester (Sept. 16 & 23, 1988, respectively), *compiled in* Board Record (Tab 4K–4). It is undisputed that Webster neither assembled nor remained with the other employees. When Webster failed to appear, McCain went looking for him. The AJ found Webster "left the area to get some ice cream." *Webster*, slip op. at 7. Upon Webster's return, McCain told him he had not received permission to leave. The record reflects that McCain asked Webster why he did not stay for the fire drill. Webster stated he had vacated the building and that was all that was required. McCain reminded Webster he had instructed everyone "to assemble outside on the grass" and explained that he "was in charge of the assembly." Disposition Form, by Willie L. McCain, Chief, Postal/Distribution Branch (Sept. 21, 1988) *compiled in* Board Record (Tab 4K–4). Webster conceded he responded to McCain's statement that as supervisor he was in charge, saying, "In charge of what?" *Webster*, slip op. at 7.

Webster also testified, and now argues before us, that he was either on union time or break time during the fire drill assembly. As the AJ noted, "[Webster's] testimony on this issue is internally inconsistent." *Id.* The AJ also found it unsupported on both points. *Id.* The AJ there-

fore concluded, "I have rejected the appellant's testimony on this issue." *Id.* Rejecting Webster's other excuses, the AJ sustained a charge of insubordination and also one of disrespectful conduct.

3. On October 17, about one month later, Webster failed to follow a specific instruction from McCain to use a rubber stamp to mark mail to be forwarded and did not do so on three letters. *Id.* at 10. Before the AJ, Webster testified he was not told to use the stamp; however, the AJ found that Webster was so instructed but failed to follow the instruction. *Id.* at 10–11. The AJ sustained the specification for failure to follow the supervisor's stamping instruction.

The AJ also found Webster was disrespectful to McCain. *Id.* at 11. Webster argued with McCain, stating that this procedure was not required on another Army base. *Id.* Procedures at other Army bases were not viewed as controlling with regard to procedures required at Fort Bragg. Nor was it found sufficient that a Department of Defense mail manual did not require the procedure followed at Fort Bragg. The AJ found Webster stated that he knew more about mail procedures than his supervisor. Because of that statement, the AJ found Webster "intentionally challenged his supervisor's authority." *Id.*

4. About two weeks later, on November 1, 1988, Webster loudly interrupted a conversation inside the postal facility about complying with postal procedures that Lt. Michelle Perna and Sgt. Reese were conducting with Mr. Chapman, another civilian postal employee, with a "childish tirade." According to the AJ's findings, Webster yelled at Lt. Perna, used crude language, and "embarrassed and humiliated" the military personnel. *Id.* Lt. Perna, a platoon leader, reported the incident herself. At the hearing, according to the AJ, she testified "that the appellant was rude and disrespectful *to her*...." *Id.* (emphasis added). In his testimony, Webster conceded he intervened in Lt. Perna's meeting, which did not concern him, and referred to someone as a "jack asshole." *Id.* at 12. As the AJ

noted, her account of the incident was corroborated by Mr. Chapman. *Id.*

The AJ sustained charges that Webster created a disturbance and was discourteous to the military personnel. *Id.*

5. On November 8, when McCain questioned whether Webster had sent certain mail on distribution, Webster responded, "Are you crazy?" *Id.* Webster contended he was provoked by his supervisor, but the AJ noted Webster "offered no evidence to support this assertion." *Id.* The AJ sustained a charge that Webster had been disrespectful to his supervisor. *Id.*

In addition to the five sustained specifications for misconduct in 1988, Webster had a prior disciplinary record for four charges of misconduct in 1987, for which he was reprimanded. In 1987 McCain had proposed a five-day suspension because Webster failed to heed his request that Webster stop dropping books on the floor, but instead responded that he "didn't 'give a fuck.' " *Id.* at 16. The record reflects that this incident occurred in the presence of Webster's co-workers. In responding to McCain's proposal to suspend Webster, Bickford, the deciding official, wrote, "Although there is no excuse for [Webster's August 24, 1987] behavior, Mr. Webster's supervisor is partially responsible for the turmoil in this branch." Disposition Form, by Judith Bickford, Acting Chief (Nov. 17, 1987) (Record of Prior Disciplinary Action), *compiled in* Board Record (Tab L). Consequently, Bickford determined Webster would receive a written reprimand rather than a suspension. He was reprimanded by letter of February 1, 1988, for "insubordination, disrespect toward his supervisor, creating a disturbance, and use of abusive and offensive language" in August, 1987. *Webster*, slip op. at 16.

Webster had replied to the proposed 1987 suspension, alleging "that the action was in reprisal for a complaint he took to the union." *Id.* Apparently, his claim was rejected by Bickford. The AJ found there was no reason to discount this prior mis-

conduct. Webster was specifically warned in the letter of reprimand that "future incidents of this nature will not be tolerated and will be the basis for more severe disciplinary action." Notice of Decision–Reprimand, by Judith Bickford, Acting Chief (Dec. 3, 1987), *compiled in* Board Record (Tab L).

The AJ found that Webster's 1988 offenses directly "impacted" the efficiency of the service. *Webster*, slip op. at 14. Specifically, the AJ found Webster had "*openly defied* his supervisor and created confusion and tension in the work environment." *Id.* at 15 (emphasis added). Such findings, together with his finding that appellant showed no remorse, *id.* at 17, provided the stated basis for the AJ's upholding an adverse action against Webster.

As to the appropriateness of the removal penalty, the AJ expressly weighed the *Douglas* factors relevant to this case. *Id.* at 15–17. The AJ noted that the removal penalty was consistent with the agency's table of penalties. The AJ stated: "The agency cannot tolerate disrespectful conduct to a supervisor, the *open* refusal to follow supervisory directives and discourteous conduct to military personnel." *Id.* at 16 (emphasis added). Webster's argument that the agency had "overexaggerated his conduct" in selecting the removal penalty was specifically considered. *See id.* The AJ disagreed with Webster's view, finding the misconduct "serious." *Id.* Noting also Webster's prior record for three of the same offenses, the AJ concluded: "I find that the removal penalty is not excessive, disproportionate to the sustained offense [sic] or arbitrary, capricious, or unreasonable." *Id.* at 17.

▪ In front of the AJ, Webster raised two affirmative defenses. Webster alleged race or color discrimination because the removing official was white and he is black. The AJ, however, rejected the defense because "the appellant did not present *any* evidence or argument" in support. *Id.* at 12 (emphasis added).[1]

---

1. Before us, Webster does not assert race or color discrimination, which would divest this court of subject matter jurisdiction, provided the discrimination allegation was nonfrivolous.

As before, Webster also defended against the charges on the ground of retaliation for union-related activity as well as for contacting a U.S. Postal Inspector and a U.S. Senator to complain about McCain. Noting that the supervisors were aware of Webster's protected activity, the AJ found that the "adverse action under review could, under the circumstances, have been retaliation." *Id.* at 13. Finding that "the sustained offenses are serious," *id.* at 16, and "[t]he four incidents involving Mr. McCain all involve active misconduct on appellant's part," *id.* at 14, the AJ found that, despite the agency's high retaliatory motive, the discipline actually resulted from "the objective facts." *Id.* Webster offered no evidence of disparate treatment for other Army postal employees who engaged in similar conduct. The AJ rejected the defense of retaliation. *Id.*

## OPINION

### I. *The Five Specifications Sustained*

After reviewing the record, the briefs, and the AJ's opinion, we hold that none of the findings is arbitrary or capricious or unsupported by substantial evidence and none of the conclusions is an abuse of discretion, was reached without required procedures or is contrary to law. 5 U.S.C. § 7703(c) (1988).

■ All five specifications sustained were supported by substantial evidence on the record before us. In addition to resting heavily on credibility determinations concerning the various agency witnesses and Webster, the AJ's findings are in many cases undisputed by Webster, who admits to the conduct alleged but offers excuses. We hold they were properly rejected as legally insufficient. Beyond the facts set forth in our Background section, we explicitly address only the two sustained specifications which the dissent believes were not supported by substantial evidence.

*See Hill v. Department of the Air Force,* 796 F.2d 1469, 1471 (Fed.Cir.1986) ("minimal *prima facie* case" of discrimination required).

**2.** It is well established that an appellate court may infer findings necessary to explicit findings

Webster was found insubordinate because he violated a specific, repeated instruction to report to his supervisor, daily, before turning in his vehicle. It is undisputed that on September 13, 1988, Webster did not report as instructed.

■ We think that in such a military/postal employment setting, the efficiency of the service requires that an immediate supervisor's lawful instructions must be followed by clerks like Webster, even if they think the instructions are foolish, and even if they are correct. It was Webster's duty to follow the reporting instruction. Therefore, whether or not McCain's instruction was wise, Webster's noncompliance cannot be excused.

■ The dissent questions why the AJ "discredited" Webster's excuse for defying the "policy" of reporting in, particularly since, despite his noncompliance, Webster did not incur overtime costs, the sole purpose of the policy. The record reflects, however, that what is referred to as a "policy" was not only of long standing, but was actually an explicit instruction which McCain had repeatedly and personally counselled Webster to follow. Notice of Proposed Removal, *compiled in* Board Record (Tab J). Far from disbelieving Webster, the AJ, by necessary implication,[2] determined his excuse was legally insufficient. We cannot disagree. While the dissent also faults the AJ for "defective" analysis on this issue, we think that the AJ's failure to explain specifically why he was unpersuaded by Webster's excuse, when it was legally irrelevant, cannot constitute reversible error. Webster cites no authority requiring insubordination to be flagrant or continual before discipline may be imposed. We have said that insubordination "is a willful and intentional refusal to obey an authorized order of a superior officer which the officer is entitled to have obeyed." *Phillips v. General Servs. Ad-*

of a prior tribunal. *See, e.g., Bott v. Four Star Corp.,* 807 F.2d 1567, 1576 (Fed.Cir.1986); *see generally* 5A J.W. Moore & J.D. Lucas, *Federal Practice* ¶ 52.06[2], at 151–52 (2d ed.1989).

*min.,* 878 F.2d 370, 373 (Fed.Cir.1989). There was substantial evidence that Webster violated a lawful instruction, without lawful excuse.

 The dissent next expresses concern that this one infraction is de minimis, merely a procedural violation. Although, by itself, this single incident may not be "serious" or, alone, sufficient to support removal, it must be, as it was, considered by the AJ *along with* the other four sustained incidents in determining that Webster's combined misconduct was "serious." Furthermore, no authority is offered to support the proposition that violations of instructions cannot support disciplinary action if they are merely procedural.

Likewise, we hold there is substantial evidence to support the finding Webster was insubordinate regarding the fire drill instruction. The AJ found that McCain instructed everyone "to assemble on the lawn," *Webster,* slip op. at 7, and the record reflects McCain shouted, "Fire, fire, *fall out* on the grass in front of the Postal Branch...." Disposition Form, by Willie L. McCain, Chief, Postal/Distribution Branch (Sept. 21, 1988), *compiled in* Board Record (Tab 4K–4) (emphasis added). As everyone knows who is familiar with terminology commonly used on an Army base, even by civilian employees, "fall out" means assemble and remain assembled until expressly dismissed or otherwise instructed.

McCain's own testimony was by no means the only evidence of the specific content of his fire drill instruction. The record also contains statements by employees that he instructed them to assemble and remain at a designated place outside. *See* Statements of Warren P. Basnight and Peggy E. Worcester (Sept. 16 & 23, 1988, respectively), *compiled in* Board Record (Tab 4K–4). McCain asserts he saw Webster leave the building with the other personnel but then he could not find Webster in the designated assembly area. Disposition Form, by Willie L. McCain, Chief, Postal/Distribution Branch (Sept. 21, 1988), *compiled in* Board Record (Tab 4K–4). The reason, according to the AJ's finding, was that Webster left the area to get ice cream. *Webster,* slip op. at 7. Webster admits departing and making the statement to McCain on his return that the AJ found disrespectful.

As to whether McCain instructed Webster to assemble for the fire drill, the AJ found that McCain "instructed *all employees* to assemble on the lawn in front of the branch." *Id.* (emphasis added). Employees are quoted in the record as agreeing that McCain instructed them to "assemble outside on the grass" and that McCain reported he told everyone to "fall out on the grass," as reflected in the Disposition Form he made less than a week after the fire drill incident. The record reflects that Webster "was present at his desk" when the fire drill was called. Disposition Form, by Willie L. McCain, Chief, Postal/Distribution Branch (Sept. 1, 1988), *compiled in* Board Record (Tab 4K–4). Thus, Webster was present and it cannot reasonably be disputed that he heard the instruction to assemble. In addition, the specific content of his fire drill instruction was testified to by McCain and the AJ believed that testimony. Accordingly, there was substantial evidence to support the AJ's finding that McCain "instructed all employees to assemble on the lawn in front of the [postal] branch." *Webster,* slip op. at 7. Thus, there is substantial evidence of record to support the AJ's sustaining charges for Webster's insubordination and disrespect to his supervisor.

## II. *Penalty*

 Petitioner argues that the penalty of removal is excessive for the five specifications, of the original eleven brought, that were sustained by the AJ. Our review of penalty, however, is highly deferential. It is well-established that selecting the penalty for employee misconduct is left to the agency's discretion. *Parker v. United States Postal Serv.,* 819 F.2d 1113, 1116 (Fed.Cir.1987) ("[D]eference is given to the agency's judgment ... unless the penalty is so harsh and *unconscionably disproportionate* to the offense that it amounts to an abuse of discretion.") (internal quotations

omitted) (emphasis added); *DeWitt v. Department of Navy*, 747 F.2d 1442, 1445 (Fed.Cir.1984), *cert. denied*, 470 U.S. 1054, 105 S.Ct. 1759, 84 L.Ed.2d 822 (1985) ("This court will not disturb the agency's choice unless the severity of its action appears *totally unwarranted* in light of the relevant factors.") (emphasis added). While, as the AJ acknowledged, the penalty must be reasonable in light of the sustained charges, our court has effectively defined reasonable in this context to mean merely that the agency's choice of penalty not be "grossly disproportionate to the offense...." *Miguel v. Department of Army*, 727 F.2d 1081, 1083 (Fed.Cir.1984). Whether this court would have chosen a different penalty is irrelevant. *See Hunt v. Department of Health and Human Servs.*, 758 F.2d 608, 611 (Fed.Cir.1985). Here, the AJ found the agency had not properly considered the *Douglas* factors and therefore independently considered and discussed them himself. *Webster*, slip op. at 16.

### A. Compliance with Douglas

The AJ specifically analyzed the removal penalty in light of each of the four factors of 12 enumerated in *Douglas v. Veterans Administration*, 5 M.S.P.R. 280 (1981), applicable to the facts of this case. The AJ determined that the removal action was "appropriate and reasonable under the circumstances." *Webster*, slip op. at 15. We think a fair reading of the AJ's lengthy opinion as a whole demonstrates "that the presiding official identified, balanced and then considered the relevant *Douglas* factors in determining that the sustained charge[s] warranted the penalty imposed." *Kline v. Department of Transp.*, 808 F.2d 43, 46 (Fed.Cir.1986). Indeed, the penalty discussion itself is probably sufficient on its face. *See Webster*, slip op. at 14–17.

■ Petitioner argues, however, that he was not given an adequate *Douglas* factor review. Apparently, petitioner objects that the other factors listed in *Douglas* were not discussed by the AJ. But the AJ need not consider every one of the 12 *Douglas* factors "mechanistically by [a] preordained

formula." *Douglas*, 5 M.S.P.R. at 306. In his *Douglas* review in the penalty section of his opinion, the AJ explicitly addressed the nature and seriousness of the five charges he sustained. The AJ also expressly considered petitioner's past disciplinary and performance records, and the deleterious effect of his course of misconduct on his ability to perform his job. *Webster*, slip op. at 15. The AJ found that the five sustained charges of misconduct have a "direct nexus to the efficiency of the service" and that Webster's duties included assisting military mail clerks and units with regulatory compliance and training. *Id.* Further, the AJ noted Webster had a short tenure, a prior disciplinary record with the Army including three of the same violations, and failed to express any remorse. *See id.* at 15–17. The AJ's conclusion that the agency did not abuse its discretion in selecting removal cannot be overturned on the basis of the AJ's opinion and its discussion of the *Douglas* factors.

### B. Provocation as Mitigation

■ One of the *Douglas* factors requires consideration of "mitigating circumstances surrounding the offense[s] such as ... personality problems ... or provocation on the part of others involved in the matter[s]." 5 M.S.P.R. at 305. Moreover, unless all *"significant* mitigating circumstance[s]"* are considered, the adverse action cannot be sustained. *Van Fossen v. Department of Hous. and Urban Dev.*, 748 F.2d 1579, 1581 (Fed.Cir.1984) (emphasis added).

■ The dissent criticizes the Board for its "failure to consider an important factor relating to mitigation" regarding Webster's removal, namely "the animus of Supervisor McCain towards Webster." Far from failing to consider it, the AJ discussed it explicitly. Further, he found "the appellant's supercilious and boastful demeanor generated *some* personal animus with his supervisors." *Webster*, slip op. at 14 (emphasis added). Thus the AJ did address "the animus of Supervisor McCain towards Webster," apparently finding it attributable more to Webster than McCain. The AJ also found that Webster "actively sought

to confront [McCain] at every opportunity." Regardless of its genesis, however, the AJ, by necessary implication, found that the animosity did not cause the removal.[3] *Id.*

But even assuming that personal animus against Webster was caused solely by McCain, and that it was a factor in McCain's recommendation of removal, Bickford, the removing official, was herself neutral *and* aware of McCain's prior attitude about Webster. Indeed, the year before she reduced the penalty recommended by McCain specifically because of "turmoil in the branch." That she did not do so again in 1988 may suggest that she did not find turmoil or animus was a significant factor then. In any event, there is simply no record basis to question her neutrality. Webster has offered no direct evidence of animus on her part. The AJ made no finding of such animus. We cannot conclude he was *compelled* to make such an inference, either. *See Frampton v. Department of Interior,* 880 F.2d 1314, 1317 (Fed. Cir.1989) (Employee failed to prove his supervisor, the proposing official, was motivated by "personal animus" and "neither showed nor even alleged that [the removing official] had a retaliatory motive."). Moreover, it appears she was two levels above McCain. Any animus between McCain and Webster, whether generated by Webster or by McCain, or by both, is therefore eliminated as a *significant* motivating factor in Bickford's decision to remove Webster. Her impartiality is apparent from her knowledge of McCain's attitude toward Webster, her reduction of the prior penalty, and her lack of personal involvement in either the tension between McCain and Webster or Webster's protected activity. It is not insignificant that Webster's complaint to the Postal Inspector and the Senator concerned McCain, but not Bickford. Indeed, the AJ effectively found Ms. Bickford was neutral when he referred to "objective facts" supporting the adverse action. *Id.*

The AJ clearly found that the penalty was reasonable, *i.e.,* not grossly dispropor-

tionate, based on the gravity of the sustained offenses, Webster's prior disciplinary record, his short tenure, and his lack of remorse. The AJ discussed each of these items individually. Again, Bickford's neutrality is important because she actually made the decision to remove. The AJ concluded that animus was not a significant factor either as to taking an adverse action or as to selecting the penalty of removal. A fair reading of the AJ's opinion as a whole demonstrates that the AJ did not fail to consider animus as a mitigating factor in determining the lawfulness of the penalty, or to consider it adequately.

### C. Opinion Read as a Whole

■ The most serious criticism that can be directed against the AJ's penalty discussion, *id.* at 14–17, is that it does not *repeat* all the findings stated earlier that are also relevant to penalty. For example, in the section analyzing the sustainability of each of the specifications, the AJ stated that Webster "embarrassed and humiliated" military personnel, Lt. Perna. *Id.* at 11. This could have been, but was not, explicitly repeated in the penalty discussion as relating to the *Douglas* factor concerning how the offenses affected his "supervisors' confidence in [Webster's] ability to perform [his] duties," which included training military mail clerks. 5 M.S.P.R. at 305. Similarly, Webster was found insubordinate: He ignored instructions to assemble and remain in front of the post office during a fire drill, a time when even more than usual employees must be relied upon to follow instructions. *See* Disposition Form, by Willie L. McCain, Chief, Postal/Distribution Branch (Sept. 1, 1988), *compiled in* Board Record (Tab 4K–4). This incident, too, could have been discussed again in relation to the *Douglas* factor regarding Webster's "dependability." 5 M.S.P.R. at 305. Likewise, Webster's other repeated incidents of disrespect and insubordination could have been discussed again in the context of the *Douglas* factor regarding

---

**3.** The dissent speculates that McCain's animus against Webster, deemed by Bickford to be present in 1987, continued through 1988. The AJ did not make such an inference. Nor on this record was the AJ, as a matter of law, required to draw such an inference.

"whether the offense[s were] intentional ... or frequently repeated." *Id.*

Each incident, however, was adequately detailed in the context of describing the charges sustained; they need not be repeated in the penalty discussion. In the final analysis, challenges to the organization of the AJ's opinion are simply not grounds for reversing the Board's decision.

### D. Gravity of the Misconduct

The question remains whether the AJ's fact findings relevant to the penalty of removal, as opposed to lesser potential alternatives, were unsupported by substantial evidence. The AJ found that "the sustained offenses are serious." *Webster,* slip op. at 16. We cannot overturn that finding on this record. The dissent minimizes the seriousness of the sustained charges noting that the AJ must assess the underlying conduct, not just its labels. We conclude from our review of the AJ's opinion as a whole that he did indeed weigh the underlying conduct and did so adequately. Moreover, we conclude that, like the AJ, we must consider the conduct in context. The AJ properly noted that the U.S. Army "cannot tolerate disrespectful conduct to a supervisor, the *open refusal* to follow supervisory directives and discourteous conduct to military personnel." *Id.* (emphasis added). The AJ thus supported his conclusion that in light of Webster's conduct, the Army's decision to remove him was justified for the efficiency of the service, based on the five specifications sustained. *Id.* at 14; *see Bassett v. Department of Navy,* 34 M.S.P.R. 66, 69 (1987) ("The disobedience of proper orders by an employee is done at the risk of being insubordinate and may be sufficient cause for removal"—three incidents in eight months); *see also Roberson v. Veterans Admin.,* 27 M.S.P.R. 489, 494 (1985) (abusive language and disrespectful behavior can constitute just cause for removal).

In this regard, the AJ's finding that petitioner "was discourteous and he created a disturbance" in his confrontation with Lt. Michelle Perna, *Webster,* slip op. at 12, is particularly important. Although we need not and do not so conclude, the Perna incident alone might have put Webster's removal within the discretion of the agency because his position was at a postal facility on a military base and his duties brought him into regular contact with military personnel, both commissioned and enlisted, including mail clerks in military units. As the AJ noted, "disrespectful behavior is not acceptable conduct, not conductive [sic] to a stable working atmosphere and may constitute just cause for removal." *Id.* at 14 (citations omitted). That principle may apply with even greater force in a military setting, as here, for Webster must operate both at the postal facility and in military units and work directly with not only civilians, but also with soldiers. Unfortunately, the record shows he was equally disrespectful to his own supervisor and the military personnel.

Moreover, the record reveals that, like several of his other incidents of discourtesy, Webster's tirade to Lt. Perna was overheard by other military personnel and other postal workers. The corrosive effect of such a public spectacle on military discipline and postal employee morale cannot be overlooked. The AJ noted that "Lt. Perna is a Platoon Leader" and "was embarrassed and humiliated by the appellant's conduct" which included rudely interrupting, yelling, and referring to someone as a "jack asshole." *Id.* at 11–12. Indeed, Lt. Perna's report of the incident states that Webster yelled directly at her and refused to lower his voice, despite her request. Statement of Lt. Perna, *compiled in* Board Record (Tab 4G). The AJ also noted that "Lt. Perna reported the incident herself." *Id.* at 14. We conclude the AJ did consider and reasonably assess the underlying conduct. In finding it sufficiently serious to warrant removal, the AJ concluded the Army did not abuse its discretion. We agree. We simply cannot say removal is totally unwarranted or unconscionably or grossly disproportionate to the sustained offenses.

### III. *Reprisal*

Petitioner contests his removal as taken in reprisal for his activities as a

new union shop steward and for letters written to a U.S. Senator and a U.S. Postal Inspector complaining about McCain. In part, his contentions mirror those rejected in his prior disciplinary proceeding when he claimed he was being sanctioned for grieving to the union. The AJ demonstrated he correctly understood the applicable legal test when he stated that:

> To establish reprisal as an affirmative defense, [Webster] must meet the test for reprisal as restated by the Federal Circuit in *Warren v. Department of the Army*, 804 F.2d 654, 656–58 (Fed.Cir. 1986). The four elements of this test are: (1) The employee engaged in a protected activity; (2) the accused official knew of the protected activity; (3) the adverse action under review could, under the circumstances, have been retaliation; and (4) there was genuine nexus between the retaliation and the adverse action.

*Webster*, slip op. at 3.

Applying the four part *Warren* test to the facts, the AJ found that Webster was engaged in protected activities; that his supervisors were aware of the activities; and that the adverse action under review *"could*, under the circumstances, have been retaliation." *Id.* at 13 (emphasis added). Those findings, establishing the first three elements of the *Warren* test, are supported by substantial evidence. For the affirmative defense of reprisal to be established, however, the AJ must also make a fourth finding: that there is a genuine nexus between the retaliatory motive[4] and the adverse action. But no such finding was made here. Nor was one compelled by this record, although the dissent concludes otherwise.

 *Warren* specifically states that the petitioner "has the burden" of establishing the four elements of retaliation. 804 F.2d at 656, quoting *Hagmeyer*, 757 F.2d at 1284; *see Stromfeld v. Department of Justice*, 21 M.S.P.R. 428, 431 (1984) (employee has the burden of establishing a prima facie case of reprisal); *see also Mortensen v. Department of Army*, 27 M.S.P.R. 433, 437 (1985); *Kennedy v. Department of Army*, 22 M.S.P.R. 190, 193 (1984). Thus, the AJ properly placed the burden on Webster to "meet the test for reprisal." *Webster*, slip op. at 3. Webster must carry his burden of demonstrating, *prima facie*, that retaliatory motive *was* a significant causal factor for the adverse action. *Cf. National Labor Relations Bd. v. Transportation Mgmt. Corp.*, 462 U.S. 393, 401, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983); *Mount Healthy School Dist. v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977); *see Stromfeld*, 21 M.S.P.R. at 431 (burden shifts from the petitioner once all elements of reprisal are established, including "causal connection between the protected activity and the adverse action," *i.e.*, nexus).

The burden of demonstrating a "nexus" between "the retaliation and petitioner's removal," *Warren*, 804 F.2d at 656, ultimately involves establishing a causal connection between the protected activity and the adverse action, as the Board correctly phrased it in *Stromfeld*, 21 M.S.P.R. at 431.

Nor is the burden too onerous. Petitioner is not required to produce direct evidence of the deciding official's intent, but only evidence from which the AJ can properly infer that the retaliatory motive caused the adverse action. *Warren*, 804 F.2d at 657, quoting *In re Frazier*, 1 M.S.P.R. 163, 193 (1979). Because direct evidence, such as an explicit admission, rarely is available, the Board has accurately noted, "in almost all situations [the causal connection] must be inferred from circumstantial evidence." *McClellan v. United States Postal Serv.*, 19 M.S.P.R. 237, 239 (1984); *see Frazier*, 1 M.S.P.R. at 194. If, for example, Webster had offered evidence of other employees at his postal facility who engaged in comparable conduct but

---

**4.** Although *Warren*, uses the word "retaliation," 804 F.2d at 656, quoting *Hagmeyer v. United States*, 757 F.2d 1281, 1284 (Fed.Cir.1985), the majority makes clear that this term must be understood as referring to retaliatory motive since "retaliation" is the conclusion that follows only if all four elements of the test are met and since, if understood literally, it would make element (3) moot element (4). *See Warren*, 804 F.2d at 656–57, 658.

received more lenient sanctions, the AJ could have found nexus was established. *See Stromfeld*, 21 M.S.P.R. at 432 (Employee attempted to show that other employees "committed more serious acts of misconduct than he and were either not disciplined or less severely disciplined."). Webster would be likely to know of any disparate disciplinary action taken, or indeed not taken, against similarly situated fellow workers who engaged in comparable conduct.

On the record before us, however, petitioner offered no such evidence. The AJ did not find that Webster's protected activities caused the adverse action and we cannot say this record, as a matter of law, requires such an inference of nexus.

The AJ did find that "the intensity of the agency's retaliatory motive was high." *Webster*, slip op. at 14. He then weighed the high intensity retaliatory motive against the gravity of the misconduct. Although he found that retaliatory motive "could" have been a factor, he did not find that the retaliatory motive *was* a factor in Webster's removal. Retaliatory motive does not, *ipso facto* require a finding of causation. The dissent glosses over this important distinction between "could have been" (element 3) and "was" (element 4), but it is dispositive of this appeal.

The AJ found that of the five of eleven specifications sustained, four involved McCain and one involved Lt. Perna, that Lt. Perna reported the incident herself, and that the four incidents involving McCain all included *active misconduct* on Webster's part. The AJ then found "that an imaginary supervisory [sic] who was unaware of [Webster's] protected conduct would conclude from the objective facts that an ad-

verse action was warranted." Accordingly, the AJ concluded that the affirmative defense of reprisal failed. *Id.*

The AJ's finding about an "imaginary supervisor" followed, nearly verbatim, the test we stated in *Warren:* An adverse action may be sustained if the AJ finds "in effect, that an imaginary supervisor who knew nothing of the [protected activity] would have been led by the objective facts to find [the employee's misconduct warranted removal]." 804 F.2d at 659. Furthermore, unless petitioner establishes all four elements of reprisal, *prima facie, Warren* simply requires nothing of the agency. If reprisal has been proven, *prima facie, Warren* requires nothing more of the agency than that it present proof on the basis of which the AJ could find that an "imaginary supervisor" would have taken an adverse action, anyway.[5] Where a *prima facie* case of reprisal has been established, the fact finder should evaluate any rebuttal evidence offered in light of the questions so elaborately set forth in the dissent. If the AJ does so find, the agency has rebutted the *prima facie* case of retaliation.

The AJ implicitly found Webster's removal was not caused by his protected activity and explicitly found it was caused by his conduct, based on the evidence submitted, including the repetition and gravity of the 1988 conduct as well as his prior disciplinary record. That the AJ *could have* inferred retaliation (nexus) does not mean, as a matter of law he *had to*. The AJ's findings relating to possible retaliation depended heavily on his assessing credibility and weighing conflicting evidence, particularly concerning the gravity

---

5. As this case and *Warren* both illustrate, even where nexus was not established by petitioner, the AJ, exceeding any requirement, often will take the precaution to determine "whether there are independent grounds for initiating an action against an employee." 804 F.2d at 657. By doing so, he provides an alternative ground of decision that would control if a reviewing court overruled the finding on the failure to establish a *prima facie* case of retaliation. *See Rogers v. Department of Defense Schools*, 814 F.2d 1549, 1555 (Fed.Cir.1987) (Some evidence of retaliation is insufficient if there is "substantial evi-

dence that [petitioner's] removal was based on legitimate employment considerations."). It simply is not legal error for the agency to submit, and the AJ to consider, evidence of the agency's legitimate employment considerations to aid in the determination of whether petitioner has established nexus. It simply cannot be a prerequisite to consideration of such proof that first the burden must shift, particularly where, as here, that evidence was also relevant to proving the misconduct charged and thus is submitted in the agency's case in chief.

and excusability of Webster's conduct. Petitioner simply has not shown how the AJ's ultimate finding against him as to reprisal, or any of the necessary underlying findings, is unsupported by substantial evidence. Accordingly, we hold that petitioner failed to establish *prima facie* retaliation and therefore without need of any rebuttal evidence by the agency, on this record his defense of retaliation must fail. That the AJ nevertheless applied the "imaginary supervisor" test does not constitute reversible error, especially where, as here, the finding is intertwined with whether petitioner has established nexus. For example, if the AJ had found Webster's conduct was less serious or partly excusable, the inference might be drawn that retaliation had been established *prima facie*. In any event, it would make little sense to direct the AJ not to consider previously submitted agency evidence relevant to retaliation unless he has already found a *prima facie* case, including nexus.

In sum, this appeal must be resolved under *Warren*. Properly construed, the *Warren* test is not met by demonstrating that a retaliatory motive "could have" been the cause of the adverse action. That merely meets element three of the affirmative defense of reprisal. The third element can be met, for example, by showing that the removing official might well have resented the protected activity as where it reflected poorly on him. Conversely, if the adverse action preceded the protected activity, one cannot conclude the former "could have been" the cause of the latter. Once the third element of the reprisal defense is met, however, the petitioner must still persuade the AJ of nexus, *i.e.*, causation in fact. Here the AJ was not so persuaded. We cannot reverse because on this record any such inference, even if permissible, certainly was not mandatory.

## CONCLUSION

The sustained specifications are supported by substantial evidence. The find-

ings fully support the conclusion that petitioner's pattern of disruptive misconduct undermined military discipline and postal employee morale and impaired the efficiency of Army postal operations. His open insubordination, open refusal to follow instructions, and public disrespect to his supervisor and to military personnel were particularly harmful. Therefore an adverse action was lawful. Petitioner has failed to demonstrate that, despite his repeated misconduct in 1988, his prior disciplinary record for three of the same offenses in 1987, and his lack of remorse, his removal was "grossly disproportionate" to the five offenses sustained and thus an abuse of the agency's discretion. Nor has he shown his removal was retaliatory because petitioner did not carry his burden to show nexus: that his protected activity created animus leading to retaliatory motive that actually caused his removal. The AJ's decision must therefore be

AFFIRMED.

NIES, Chief Judge,* dissenting.

I would *vacate* the administrative judge's affirmance of Webster's removal and *remand* for reconsideration of the chosen penalty and of the defense of reprisal. Even including the two charges I believe were improperly sustained, the administrative judge (AJ) made a major reduction in the number of sustained charges. The nature of the conduct underlying these sustained charges and the failure of the AJ to consider a relevant mitigating factor precludes affirmance of the penalty. Further, the AJ found no reprisal under an incorrect legal standard and, thus, his decision cannot stand on this issue.[1]

## I Background

Alton Webster was employed as a military mail clerk, GS–305–05, directly under

---

* Chief Judge Nies assumed the position of Chief Judge on June 27, 1990.

1. Where an incorrect legal standard has been applied which requires different or additional factual inquiries from those undertaken by the

factfinder, the matter must be referred back for such findings. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1565, 1 USPQ2d 1593, 1595 (Fed.Cir.), *cert. denied*, 481 U.S. 1052, 107 S.Ct. 2187, 95 L.Ed.2d 843 (1987).

the supervision of Willie McCain. Webster was charged with 11 incidents of misconduct in support of his removal. The gist of each charge is as follows: (1) discourteousness to two soldiers resulting from yelling to them to move a vehicle they had parked which was blocking other vehicles (not sustained); (2) insubordination to Supervisor McCain stemming from an incident where Webster made a flippant remark after being asked for a copy of Webster's lecture plan when all instructors use the same plan that was on file (not sustained); (3) insubordination in failure to follow McCain's policy of returning to the office prior to turning in a government vehicle; (4) insubordination in leaving a fire drill after evacuation of the building to go get ice cream; (5) insubordination and willful misuse of a government vehicle arising from an incident where Webster went outside the chain of command to report that McCain had mishandled the mail; after being counselled, Webster did not report directly to work as instructed but instead used a government vehicle to drop off training manuals (not sustained); (6) disrupting the workforce by asking a fellow mail clerk to draft a letter regarding her desire to have a meeting, as proposed by Webster, with the Colonel (not sustained); (7) insubordination due to Webster's failure to sign out upon leaving the building when McCain had removed the sign-out board without telling Webster (not sustained); (8) failure to follow instructions regarding the use of a rubber stamp when processing three letters for a forwarding location; (9) violating rules and regulations by tearing an article from a newspaper which had been discarded in the dumpster (not sustained); (10) discourteousness to Lt. Perna by Webster's "childish tirade" which interrupted her conversation with another officer; and (11) disrespectful conduct towards McCain by replying "Are you crazy?" when asked if Webster had placed some mail in distribution or COM center. This listing reveals one salient point. Virtually every charge involves Supervisor McCain or was initiated as a cause for discipline by McCain, save only charges (5) and (10). Indeed, SPC. Wallace, a military mail clerk, stated that

McCain was "threateningly persistent" when attempting to get him to sign a statement complaining about appellant's conduct. Only 5 of the 11 charges were sustained by the AJ. Only one of the sustained charges was not initiated by Supervisor McCain. The plethora and nature of the charges asserted here, what can only be seen as a "shotgun" approach, together with the fact that few were sustained, suggest the odor of vengeance, not discipline.

## II Unsustainable Charges

Of the five charges sustained, I conclude that two of these five are not supported by substantial evidence or a reasoned analysis. Webster was charged with "insubordination" when he left the grounds of the office during a fire drill. The agency had the burden to prove that Webster was "insubordinate" when he took a "break" during the fire drill to get ice cream and was not there to receive McCain's information about a staff meeting. Webster is not charged simply with failure to follow fire drill procedures but insubordination. Such charge entails his "willful refusal" to follow McCain's instruction to remain on the grounds to receive the staff meeting information. The agency has the burden to prove that instructions were given to him that he willfully refused to obey. *See Phillips v. General Servs. Admin.*, 878 F.2d 370 (Fed.Cir.1989) ("Insubordination by an employee is a willful and intentional *refusal* to obey an authorized order of a superior officer."). However, the agency offered no evidence that McCain even spoke to Webster at the time of the fire drill. The agency, not Webster, must suffer the effect of this evidentiary deficiency. *See Wright v. Department of Transp.*, 900 F.2d 1541, 1544–45 (Fed.Cir.1990).

Evidence of McCain's instructions at the time of the fire drill is found in his statement requesting disciplinary action. He stated that when the fire drill commenced he "went around to each section calling out: 'Fire', 'Fire', 'Fall out on the grass in front of the Postal Branch using our building Emergency Evacuation floor plan.' "

These instructions alone cannot be reasonably interpreted as an instruction to Webster to remain assembled after the drill to receive information about a staff meeting. The effect of the lack of evidence of specific orders to Webster at the time is that the charge that Webster was *insubordinate* when he left the area to get ice cream is not supported by substantial evidence. *Phillips v. General Servs. Admin.*, 878 F.2d at 374.

I also conclude that the charge that Webster was insubordinate by failing to follow McCain's policy to return to the office prior to turning in a government vehicle cannot be sustained. This charge of insubordination required proof that Webster flagrantly or continually *refused* to comply with this policy. *See Phillips v. General Servs. Admin., supra.* In fact, only one occasion of failing to report in has been documented. In addition, in sustaining this charge, the AJ relied solely on Supervisor McCain's hearsay testimony that "[a]ppellant's explanation for his failure to return was that 'the policy did not make sense.'" Webster himself stated that

> [t]o the best of my ability I have followed my supervisors [sic] instructions. On occasion because I didn't realize what time it was I was late coming in. I have never requested overtime when I came in late.

While at first blush Webster's explanation seems to be nonresponsive to the charge, it becomes relevant in light of Supervisor McCain's explanation that he adopted the policy of reporting in to cut down on unauthorized overtime. As a prophylactic measure, McCain had the employees report back to the office before quitting time so that no employees would be worked overtime without authorization.

Without articulating any reason why Webster's explanation was discredited (given the reason McCain instituted the policy), or even a statement that he was making a credibility determination, the AJ's analysis respecting this charge is defective and the

affirmance must, therefore, at least be vacated and the matter remanded for explanation. *Cf. Jackson v. Veterans Admin.*, 768 F.2d 1325, 1331–32 (Fed.Cir.1985). As articulated, the AJ's decision shows only a procedural violation which is insufficient to support a charge of "insubordination." [2]

### III Excessive Penalty

The penalty chosen by the agency must represent a "responsible balancing of the relevant [*Douglas*] factors" considering the *charges sustained. Kline v. Department of Transp.*, 808 F.2d 43, 45–46 (Fed. Cir.1986). Here the AJ not only sustained fewer than half the charges but also found that the deciding official had failed to weigh the *Douglas* factors. Moreover, the deciding official explained that her decision to remove Webster was because he had lied. Lying was not a charge. The AJ, nevertheless, sustained the action taken because the sustained charges were "serious."

The charges against Webster appear to be "serious" if one looks only at the labels given to them: "insubordination", "disrespectful conduct towards a supervisor", and "disruptive and discourteous" conduct. However, to determine the actual nature of the charge, we must examine the underlying conduct giving rise to the charge, not merely the label. *See, e.g., Miguel v. Department of the Army*, 727 F.2d 1081 (Fed.Cir.1984) (charge of theft, removal action remanded for redetermination of penalty in light of conduct amounting to theft of $2.10 worth of soap); *Stockton v. Department of Transp.*, 7 MSPB 539, 539–40, 8 M.S.P.R. 43 (1981) (reversing removal upon examination of conduct underlying charge of insubordination).

In addition to the two charges discussed above, getting ice cream during the fire drill and failing to report in before returning his vehicle, another sustained "insubordination" charge concerns the required use of a rubber stamp on a certain type of mail, which appellant did not apply

---

**2.** The AJ recognized that "insubordination" requires an "open refusal to follow supervisory directives."

to *three letters.*[3] The other two charges consist of discourteousness *in the presence* of (but not directed at) Lt. Perna and disrespectfulness in replying to Supervisor McCain "Are you crazy?" in response to a question regarding whether appellant had placed mail in a certain place. That charges can be labeled "disrespect", "disruptiveness", "discourteousness" or "insubordination" does not *ipso facto* support the penalty of removal. This rationale reads the "nature and gravity of the offense" factor out of the *Douglas* balance. The AJ appears to have fallen into this error.

The most serious defect in the AJ's analysis of the reasonableness of the penalty of removal, however, was his failure to consider an important factor relating to mitigation, namely, the animus of Supervisor McCain towards Webster. While it was unnecessary for the AJ to refer mechanically to each and every factor set forth in *Douglas* when determining the reasonableness of the penalty chosen by the agency, *see Nagel v. Department of Health & Human Servs.*, 707 F.2d 1384, 1386 (Fed.Cir.1983), our precedent does require consideration of each *Douglas* factor on which evidence is submitted. Thus, the animosity in the working relationship which was at least in part due to the supervisor had to be considered. *See, e.g., Bonds v. United States Postal Serv.*, 33 M.S.P.R. 616, 618 (1987); *Ryan v. Veterans Admin.*, 33 M.S.P.R. 463, 466–67 (1987). Failure to consider a relevant factor constitutes an abuse of discretion. *VanFossen v. Department of Housing & Urban Development*, 748 F.2d 1579, 1581, (Fed.Cir.1984); *cf. Miguel v. Department of the Army*, 727 F.2d at 1083–84.

The record here contains ample evidence of Supervisor McCain's conduct evidencing animus, including the list of baseless charges itself. Ms. Bickford, the deciding official, had recognized a year before that the "turmoil in the branch" was in part attributable to McCain. Given the context of her statement, the "turmoil in the branch" she was referring to was McCain's conduct toward Webster. The majority seeks to diminish the relevance of McCain's animus by speculating that Ms. Bickford's failure to mention animus in her removal decision means that she did not consider animus to be significant in 1988. However, nothing has been presented to suggest that the animus between McCain and Webster did not continue or continued only because of Webster. Indeed, the record shows that McCain continued to hold and act on his animus toward Webster, for example, in pressuring another employee with "threatening persisten[ce]" to supply evidence to support one of the charges.

In any event, although a factor, the AJ did not consider Supervisor McCain's animus in connection with the review of the severity of the penalty. That Ms. Bickford lacked animus is irrelevant. Ms. Bickford was obligated to consider McCain's animus in making her decision and wholly failed to do so. Thus, the error in failing to consider McCain's animus is doubly compounded.

The majority acknowledges the error in the AJ's analysis of mitigation, but excuses it, because the AJ mentioned McCain's animus in connection with the defense of reprisal. By this rationale, the majority commits legal error by equating consideration of mitigation of the penalty, an agency's affirmative duty, with consideration of reprisal, an employee's affirmative defense. An employee who fails to carry the heavy burden of the affirmative defense is still entitled to have his supervisor's animus considered as a factor in mitigation. *Cf. National Labor Relations Bd. v. Transportation Management Corp.*, 462 U.S. 393, 402, 103 S.Ct. 2469, 2474, 76 L.Ed.2d 667 (1983).

## IV Reprisal

The AJ's rejection of Webster's reprisal defense involved an improper allocation of the burdens of proof and an improper standard. Accordingly, I would vacate and remand on this issue as well.

---

**3.** Webster processed the mail correctly under the provision of a DOD Manual but not in accordance with the Fort Bragg local procedure instituted by Supervisor McCain.

Reprisal is an affirmative defense to an adverse action. 5 U.S.C. § 7701(c)(2) (1988). To establish reprisal the employee must show that he has engaged in a protected activity, that an adverse action was taken, and that his engagement in such activity caused the agency to take such adverse action against him. *See Warren v. Department of the Army,* 804 F.2d 654, 658 (Fed.Cir.1986).[4]

In this case the AJ's findings support a *prima facie* defense of reprisal. He found that Webster was engaged in the protected activities of serving as a union steward, successfully pursuing a personal grievance, and writing complaints to Congress and to postal inspectors, *inter alia,* about a racial slur attributed to Supervisor McCain. With respect to causation, the adverse action followed the protected activity; the agency was aware of the protected conduct; and he specifically found "that the intensity of the agency's retaliatory motive was high." The AJ then weighed "this high intensity retaliatory motive against the gravity of the misconduct" and concluded that "an imaginary supervisory who was unaware of appellant's protected conduct would conclude that an adverse action was warranted." Therefore, per the AJ, the defense of reprisal failed for lack of nexus. Language can be found in *Warren* and in other opinions of this court seemingly indorsing the AJ's analysis. That analysis, nevertheless, is legally erroneous.[5]

It is clearly not a basis for rejection of the affirmative defense of reprisal either that the charges against an employee are sustainable or that the charges are serious enough to warrant removal or discipline. As an affirmative defense, reprisal comes into play only where the charges would otherwise be sustained, and its application is not statutorily limited to cases where the charges are not serious. Congress has made the choice that where reprisal motivates an adverse action, reprisal in the federal workplace is more to be condemned than the misconduct of an employee. In effect, the majority here continues to hold that there can be no reprisal where the penalty is reasonable in light of the sustained charges. That view entirely vitiates the defense of reprisal.

The Supreme Court has not directly addressed the statutory defense of reprisal in the federal workplace. However, federal employees are entitled to at least the protection provided other employees. In the latter situation, the Court has directly confronted the standard for establishing nexus; that is, a causal connection between an adverse action against an employee and the employee's engagement in protected activity. In *Mount Healthy School Dist. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court vacated and remanded a decision upholding the denial of tenure to a teacher because of an incorrect allocation of the burdens of proof that the reason behind the decision to deny tenure was in reprisal for the teacher's exercise of rights protected under the first and fourteenth amendments. After establishing that the teacher had engaged in protected activity and recognizing that the Board could have dismissed the teacher for no reason at all, the Court carved out a test for causation with the goal of placing the employee "in no worse a position than if he had not engaged in the [protected] conduct":

> [9] In order to establish retaliation . . ., the plaintiff must establish three elements:
> (1) protected [activity] . . . known by the [employer];
> (2) an employment action or actions disadvantaging a person or persons engaging in protected activities; and
> (3) a causal connection between the first two elements, that is, a retaliatory motive playing a part in the adverse employment actions.

**4.** The attempt to break down the defense further into *four* elements as in *Warren* has merely created confusion. Element (2) is stated as "the officials involved in the adverse action knew of the protected activity." To state the obvious if the officials did not know of the employee's activity, such activity could not possibly have motivated the agency to take any action. The element is subsumed in causation. The clearest statement of the elements of reprisal I have noted is the following from the opinion in *EEOC v. Locals 14 and 15, Intern. U. of Oper. Eng,* 438 F.Supp. 876, 881 (S.D.N.Y.1977):

**5.** To the extent the statements in *Warren* are not dicta, I would seek *in banc* to overrule them.

Initially, the burden [is] properly placed upon [the employee] to show that his [or her] conduct was constitutionally protected, and that this conduct was a "substantial factor"—or, to put it in other words, that it was a "motivating factor" [footnote omitted] in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether *the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.* [Emphasis added.]

*Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576.

The respective burdens of proof set up by the Supreme Court in *Mt. Healthy* are not unique to constitutional challenges. The Supreme Court approved the same allocation of burdens for establishing a causal connection between removal of an employee and reprisal for protected union activities under section 8(a)(3) of the National Labor Relations Act (codified at 29 U.S.C. § 158(a)(3) (1982)) in *National Labor Relations Bd. v. Transportation Management Corp.,* 462 U.S. 393, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983). In that case, the National Labor Relations Board, relying heavily on the Court's prior decision in *Mt. Healthy,* held that to establish an unfair labor practice under the statute:

[T]he General Counsel [of the Board] ... had the burden of proving that the employee's conduct protected by § 7 [of the NLRA] was *a substantial or motivating factor in the discharge.* [footnote omitted] Even if this was the case, and the employer failed to rebut it, the employer could avoid being held in violation of §§ 8(a)(1) and 8(a)(3) *by proving by a preponderance of the evidence that the discharge rested on the employee's unprotected conduct as well and that the*

*employee would have lost his job in any event.* [Emphasis added.]

462 U.S. at 400, 103 S.Ct. at 2473.[6] In holding that the board's interpretation of the statute was not unreasonable, the Supreme Court stated that "[t]he analogy to *Mt. Healthy* drawn by the Board was a fair one." The Supreme Court, since *Transportation Management,* has approved this allocation of the burdens, as well as what must be proved, numerous times. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, —— – ——, 109 S.Ct. 1775, 1789–90, 1795, 104 L.Ed.2d 268 (1989) (opinions of Brennan, J. and White, J); *Hunter v. Underwood,* 471 U.S. 222, 225, 105 S.Ct. 1916, 1918, 85 L.Ed.2d 222 (1985); *Sure–Tan, Inc. v. National Labor Relations Bd.,* 467 U.S. 883, 895 n. 6, 104 S.Ct. 2803, 2810 n. 6, 81 L.Ed.2d 732 (1984).

The Merit Systems Protection Board first discussed the legal elements of reprisal in *In re Frazier,* 1 MSPB 159, 1 M.S.P.R. 163 (1979), *aff'd,* 672 F.2d 150 (D.C.Cir.1982). As explained in a lengthy and educational opinion, the board sought guidance from "judicial interpretation of federal statutes containing similar prohibitions against reprisals," such as the National Labor Relations Act, 29 U.S.C. § 158(a)(4) (enacted in 1935), the Fair Labor Standards Act, 29 U.S.C. § 215(a)(3) (enacted in 1938), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–3(a) to determine "what acts, and what evidence thereof, will constitute proof of ... reprisal."

Upon analysis of these statutes and cases interpreting them, the board set out the elements of reprisal as (1) protected conduct, (2) adverse action, and (3) causal connection between the two. It then considered the proof required to establish nexus or causation and concluded that "[t]he causal connection which the employee must show merely consists of *an inference of*

---

**6.** In so doing, the Supreme Court noted that this allocation of the burdens of proof did not shift the burden of persuasion on the question of whether the employer fired [the employee] *at least in part* because he engaged in protected activities, and on that grounds distinguished *Texas Dept. of Community Affairs v. Burdine,*

450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), a case which decided the question of who had the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated under Title VII of the Civil Rights Act. *Transportation Management,* 462 U.S. at 400 n. 5, 103 S.Ct. at 2473 n. 5.

*retaliatory motive* for the adverse employer action." *Frazier,* 1 MSPB at 188, 1 M.S.P.R. 163.[7]

Since *Frazier,* the board has gone on to explicate how an employee's *prima facie* case of reprisal may be overcome. In *Gerlach v. Federal Trade Comm'n,* 8 MSPB 599, 9 M.S.P.R. 268, 275–76 (1981), the Board, adopting the standard of *Mt. Healthy,* stated:

> Applying the *Mt. Healthy* test to the instant case, having previously concluded that the appellant demonstrated by a preponderance of the evidence that retaliation was a significant factor in the removal action, we must now determine whether the agency established by a preponderance of the evidence that the appellant would have been removed absent the retaliatory motive.

The board has regularly applied the *Mt. Healthy* test to determine whether reprisal occurred in adverse action cases since *Gerlach,* albeit sometimes stating a more elaborate back and forth shifting of burdens. *See, e.g., Mortensen v. Department of the Army,* 27 M.S.P.R. 433, 437–38 (1985); *Kennedy v. Department of the Army,* 22 M.S.P.R. 190, 195 n. 6 (1984); *Stromfeld v. Department of Justice,* 21 M.S.P.R. 428, 431–32 (1984); *McClellan v. United States Postal Serv.,* 19 M.S.P.R. 237, 240–41 (1984).

The decision by the AJ in this case is not in line with the Board's precedential decisions.[8] The AJ made a specific finding that "the intensity of the agency's retaliatory motive was high." That finding established the causal connection element of Webster's defense and, thus, a *prima facie* case. The agency then had to present evidence and bear the burden of proof that the adverse action would have been taken absent the agency's high retaliatory motive. *See Berube v. G.S.A.,* 820 F.2d 396, 399 (Fed.Cir.1987) (agency must prove by a preponderance of the evidence that it

would have removed employee absent the protected activity).

The question then arises: *What* must an agency prove to demonstrate that the adverse action would have been taken absent the retaliatory motive? It is not sufficient merely to hypothesize whether an imaginary unprejudiced supervisor, *on the basis of given misconduct,* would have taken an adverse action. That sterile approach divorces the decision from the reality of what has actually happened in a particular case. Instead of ignoring the evidence concerning the particular situation, a trial judge must focus on it. Reprisal can only be assessed against the entire background of the normal or routine management of a particular office as contrasted with what happened in the particular case under review. Did the agency generally tolerate the type of infraction of procedures involved? Did the charged incidents of misconduct pre-date the alleged retaliating supervisor's knowledge of the protected activity? Can it be inferred or not be inferred that the employee was singled out for discipline? Has the agency taken adverse actions of equal severity against others for similar misconduct, where, as here, the misconduct is not unique in character? Did the supervisor react to the employee's protected activity by actively seeking to obtain evidence of unprotected conduct which would support charges against the employee; did he watch this employee more; did he provoke any misconduct? Are any sustained charges directed to the employee's poor performance of assigned duties? What has been the employee's work record historically; his relationship with prior supervisors? Has the employee been disciplined before for the same type of conduct? These are the types of critical inquiries, answerable by objective evidence, which courts must consider in determining whether, absent the taint of reprisal, the action would have been taken. *See, e.g., Transportation Management,* 462 U.S. at 396–

---

7. The board also quantified the degree of retaliatory motive as "significant." *Id.*

8. Only full board decisions are precedential at the board level. The majority overturns the full

board reprisal standard discussed above because of *Warren* even though *Warren* approves the analysis in *Frazier. See* 804 F.2d 657–58. I find our precedent at best confusing and would undertake to clarify it in this case.

97, 103 S.Ct. at 2471–72; *Stromfeld*, 21 M.S.P.R. at 431–32; *Gerlach*, 9 M.S.P.R. at 277. I also believe that *Warren*, in speaking of an "imaginary" supervisor's decision, could be given an interpretation in accord with the above analysis. If it is not, the decision is contrary to Supreme Court precedent and cannot be followed.

What evidence will overcome a *prima facie* showing of reprisal can be resolved only on a case by case basis. If the agency actually submitted evidence here which might have satisfied its burden, we do not know. Neither the AJ nor the government tells us. Indeed, the government in its brief points to *no* evidence of the type that overcomes a *prima facie* case of reprisal. The government makes only the legal argument that if the charges themselves are valid, that establishes the absence of retaliation. As previously indicated, simply because the charges of misconduct are sustained does not overcome a *prima facie* case of reprisal. To paraphrase *Transportation Management*, the agency's proof is two-fold in an adverse action where a *prima facie* valid defense of reprisal has been established: (1) the action must be sustainable as a legitimate management decision resting on unprotected conduct; *i.e.*, the merits of the charges must be sustained; *and* (2) the agency must show that the employee would have lost his job in any event, *i.e.*, that the routine operations and personnel policies of the office would have brought about that result. I find the AJ's cursory analysis of reprisal to be patently insufficient [9] and would require reconsideration of this issue.

Entirely missing from the AJ's opinion here is any recognition that the agency, not Webster, had the burden to prove by a preponderance of the evidence that Webster would have been removed absent the retaliatory motive, plus a *finding* that the agency met that burden. *See Berube, supra.* As part of that burden, it is not enough to show that *some* disciplinary action would have been taken but that the *severity* of the penalty was not itself cho-

9. The entirety of the analysis is set out in the

sen as a means of reprisal. *See Gerlach*, 9 M.S.P.R. at 277 n. 13.

On the findings of the AJ, a *prima facie* case of reprisal was established. The government's argument to overcome it, namely, that the charges are valid and serious, is legally insufficient. However, it may be that there is evidence of record not discussed by the AJ or relied on in this court that might overcome a *prima facie* case. Or possibly the record should be reopened. The significant point, however, is that the AJ erred, as a matter of law, in his analysis of the causation element of reprisal. Under the correct standard, different factual findings are necessary. Thus, the decision cannot be affirmed.

V

For the foregoing reasons, I disagree with the majority that the decision sustaining Webster's removal should be affirmed. I would vacate and remand to the *full board* for its considered analysis of this case under its controlling precedent with which I agree.

APPENDIX

The opinion of the administrative judge on the issue of reprisal reads in its entirety as follows:

*The appellant did not establish the affirmative defense of reprisal.*

Reinhard U. Witiak, the Local 1770 Union President, testified that he appointed the appellant to be a union steward. He expected the appellant to be aggressive and responsive to union concerns. On cross examination he stated that he sent the appellant out to do battle with his supervisor. He stated that there was no limitation on the appellant's right as a union steward to go outside the agency's chain of command.

He testified that there was an interface problem between the appellant and Mr. McCain. He discussed this problem with Mr. McCain's boss, Gary Knight. He reported that Mr. McCain was reluctant to deal with the appellant. He sug-

attached appendix.

gested to the appellant that he confront Mr. McCain. The appellant did not take the one day training course for shop stewards until the removal notice had been issued. Mr. Witiak acknowledged that the appellant must ask for time to conduct union business.

The appellant testified that Mr. McCain had told him after a successful grievance, that, "You don't know your place, boy." The appellant testified that he wrote to Senator Helms and that he contacted United States Postal Service Inspector Hatch and made complaints about Mr. McCain.

I thus find that the appellant engaged in protected activities. The appellant's supervisors were aware of the protected activity and had actively discouraged the appellant from going outside the agency's chain of command. Six of eleven specifications were not sustained and of the five specifications sustained, four involve Mr. McCain. I thus find that the adverse action under review could, under the circumstances, have been retaliation. The appellant has satisfied the first three elements of the reprisal test.

The fourth element of the reprisal test requires me to carefully examine the intensity of retaliatory motive and weigh that intensity against the gravity of the misconduct to determine if there was a genuine nexus between the retaliation and the adverse action. *Warren,* 804 F.2d at 658.

I must find in this case that the intensity of the agency's retaliatory motive was high. I additionally note that the appellant's supercilious and boastful demeanor generated some personal animus with his supervisors. Additionally, the appellant actively sought to confront his supervisor at every opportunity. I must now weigh this high intensity retaliatory motive against the gravity of the misconduct.

Five of the eleven specifications were sustained after my de novo review. Four of these specifications involve incidents with Mr. McCain. The other in-

volved the incident with Lt. Perna. Lt. Perna reported the incident herself. The four incidents involving Mr. McCain all involve active misconduct on the appellant's part. I thus find that an imaginary supervisory who was unaware of the appellant's protected conduct would conclude from the objective facts that an adverse action was warranted. This affirmative defense must fail.