**A. Marie PHILLIPS, Petitioner,**

v.

**GENERAL SERVICES ADMINISTRATION, Respondent.**

No. 89–3002.

United States Court of Appeals, Federal Circuit.

June 26, 1989.

Peter B. Broida, Passman & Broida, Washington, D.C., argued, for petitioner.

Catherine A. Christman, Commercial Litigation Branch, Dept. of Justice, Washington, D.C., argued, for respondent. With her on the brief were John R. Bolton, Asst. Atty. Gen., David M. Cohen, Director and Mary Mitchelson, Asst. Director. Also on the brief was Charles A. Fulton, Office of Gen. Counsel, Gen. Services Admin., of counsel.

Before MARKEY, Chief Judge, SKELTON, Senior Circuit Judge, and NEWMAN, Circuit Judge.

SKELTON, Senior Circuit Judge.

A. Marie Phillips (petitioner) appeals the decision of the Merit Systems Protection Board (board), Docket No. DC07528710464, *Phillips v. General Services Administration*, 38 M.S.P.R. 206 (1988). We reverse.

### Background

The petitioner was employed as a GS–13 Financial Management Analyst in the General Services Administration's (GSA's) Information Resources Management Services (IRMS). She had worked for the government for 16 years and had a successful and unblemished record. Her job required her to make trips out of town and for that reason she was known in the agency as a frequent traveler. During the time involved in this case the agency had in force a contract with the Diners Club Co. whereby the company issued Diners Club credit cards to the frequent travelers of the agency if they desired them. The program was optional with the employees. The petitioner applied for a card, which was issued to her. The card was to be used by petitioner only when she was traveling on official government business to charge necessary traveling expenses such as transportation tickets, lodging, meals and automobile rentals. The card could not be used for purely personal or private charges. The petitioner also received free life insurance coverage in the sum of $150,000 and lost luggage insurance when her travel tickets were charged to the card. Within five days after each trip, the petitioner was supposed to turn in a travel voucher to the agency for her trip expenses, which would be paid to her by the agency in due course. Thereafter, usually about 25 days later, Diners Club would bill petitioner for the expenses charged to the card and petitioner was supposed to pay the bill to the Diners Club within 60 days after she received the bill. In this way, petitioner would not have to use any of her personal funds and had plenty of time to pay the charges.

When petitioner applied for the Diners Club card she signed a document dated April 8, 1986, that provided:

The GSA Standard of Conduct, ADM 7900.9 105–735.210 requires GSA personnel to pay their just financial obligations in a proper and timely manner. Failure to pay Diners Club bills when due could result in disciplinary action and cancellation or suspension of charge privileges.

This document was consistent with the contract that the agency signed with Diners Club, which provided in pertinent part:

Government regulations require employees to pay their just financial obligations in a proper and timely manner pursuant to Section 206 of Executive Order 11222 (May 8, 1965), and Office of Personnel Management Regulations, 5 CFR 735.-207.

After petitioner received her Diners Club card in April 1986, she began charging her official government trip expenses on the card in accordance with the arrangements described above. During April and June 1986, she charged expenses on the card in the sum of $1,761.68. She was reimbursed for these expenses by the Treasury Department in July and August 1986. In November 1986, the Diners Club advised the agency that petitioner's bills in the sum of $1761.68 had been delinquent for over 120 days and requested the agency's help in collecting the account. The above mentioned contract between the agency and Diners Club contained the following provision with reference to the collection of delinquent accounts:

The appropriate Government agency office without Government liability, may assist in the collection process of individual delinquent accounts after sixty days at the request of the contractor.

Ms. Beatrice Daly (Daly), Director, Financial Management Division, was petitioner's immediate supervisor. She contacted petitioner in November 1986, about her delinquent Diners Club bill and petitioner told her it had been paid and that she would produce the canceled check. Daly requested her to bring the check to the office, but petitioner did not do so immediately. Daly repeated the request several times, both orally and in writing, but without success. Finally, when efforts to get petitioner to present proof that she had paid the bill had produced no results, Daly issued a written official reprimand to petitioner on February 20, 1987, for insubordination and indebtedness.

The reprimand ordered petitioner to present documentation showing payment by March 2, 1987, and warned her that further delay could result in removing her from her job. When petitioner failed to produce documentation showing payment by March 2, 1987, her removal was proposed on March 4, 1987. On March 11, 1987, petitioner produced a cashier's check drawn by an accountant showing payment of the account, whereupon the deciding official dropped the indebtedness charge, but insisted that the insubordination charge warranted petitioner's removal, and she was removed effective July 4, 1987.

The petitioner appealed to the MSPB (board) whose administrative judge (AJ) held a hearing and mitigated the punishment by holding that the penalty of removal was too severe and unreasonable under the circumstances, and reduced the penalty to 60 days suspension without pay, and a reduction in grade to a budget analyst, GS–12, step 1. The petitioner and the agency both appealed to the full board, which denied both appeals for failing to meet the board's criteria for review under 5 C.F.R. § 1201.115, but reopened the case on its own motion under 5 U.S.C. § 7701(e)(1)(B) and affirmed the initial opinion of the AJ, with a few modifications. Thereafter, petitioner appealed to this court.

## OPINION

The only issue before us is whether the agency sustained its burden of establishing that petitioner was guilty of insubordination for failing to deliver to her superior Daly within the time set by Daly (by March 2, 1987) documentary evidence that the Diners Club bill had been paid. Originally, the agency sent petitioner a letter dated March 4, 1987, proposing to remove

her from her position on charges of insubordination and indebtedness. However, after the bill was paid on March 11, 1987, the deciding official, Margaret L. Neustadt, Executive Director, in her decision letter of June 24, 1987, dismissed the indebtedness charge, saying:

> [I]n view of the fact that the debt giving rise to this matter has now been paid, I have determined to drop the charge of indebtedness.

The charge of insubordination remained and petitioner was removed on that charge, hence the appeal to the board and later to this court.

■ Insubordination by an employee is a willful and intentional *refusal* [emphasis supplied] to obey an authorized order of a superior officer which the officer is entitled to have obeyed. *Yates v. Manale*, 377 F.2d 888 (5th Cir.1967). *cert. denied*, 390 U.S. 943, 88 S.Ct. 1037, 19 L.Ed.2d 1139; *Gallagher v. Department of Labor*, 10 M.S.P.B. 528, 11 M.S.P.R. 612 (1982). In this case the agency had the burden of proving an intentional refusal by petitioner to obey the order of Daly to bring in a document showing the payment of the Diners Club bill. We have concluded that the agency has not successfully carried this burden. The evidence shows that petitioner never at any time refused to obey Daly's order, but on every occasion when contacted about it promised to obey it and bring in the documentary proof of payment, which she finally did on March 11, 1987. Petitioner also surrendered her Diners Club card.

The facts show that every act of petitioner with reference to the Diners Club account during the time involved in this case was done with a view, purpose and intent to obey Daly's order by presenting to her a canceled check showing payment of the account. When Daly first approached petitioner about the account, petitioner told her the account had been paid and was current and proof would be supplied. Although this was later shown to be untrue, petitioner could well have believed it to be true under the confused circumstances existing in her private life at the time.

For instance, after petitioner received her Diners card she became engaged to marry a man named Eric Gilmartin and at that time she turned over all of her finances, including her pay checks, to him. He had agreed to pay all of her bills. When she was advised in October 1986, by Diners Club that her account was delinquent, she reported this to Gilmartin and he told her that he had paid the bill. She asked him for evidence of the payment and he promised to give it to her, but he did not do so. That could have been the reason that she told Daly the bill had been paid and that she would produce a cancelled check.

Later, when Daly was pressing her for evidence of payment, she again asked Gilmartin if he had paid the bill, as he had not shown her any proof of it. He told her he had paid it, but that Diners Club had credited the payment to his Diners card by mistake instead of paying her delinquent account. He said he preferred to pay it again rather than try to straighten it out, but he did not do so.

In the meantime, petitioner had additional personal difficulties when her mother suffered a stroke in Georgia and the wedding to Gilmartin was called off. Thereafter, petitioner was required to travel to Georgia frequently for extended weekends to aid in her mother's recovery.

On January 16, 1987, Daly sent petitioner a warning letter requesting proof of payment of the Diners Club bill. Petitioner told Daly the bill had been paid and that she had the canceled check boxed up at home in anticipation of a change of residence after marriage to Gilmartin. This was a deliberate falsehood, because she knew at that time the bill had not been paid, and she did not have a canceled check. Why she made such a statement is not known. It may be that she was playing for time until she could get Gilmartin to pay the bill and furnish her a canceled check. Whatever her reason, the misrepresentation cannot be condoned.

The payment problem not having been solved, the agency issued a reprimand for insubordination and indebtedness to peti-

tioner on February 20, 1987, and ordered her to produce documentary proof of payment of the bill by March 2, 1987, and warned her that if she did not do so, more severe disciplinary action, including removal, would result. The petitioner contacted Gilmartin again to inquire if he had paid the bill and he said he had turned his financial affairs over to his accountant, a Mr. Anderson, and he did not know whether or not he had paid the Diners Club bill. Whereupon petitioner demanded that she, Gilmartin and Anderson have a meeting.

The meeting was held on February 28, 1987, which was about the time petitioner and Gilmartin had again planned to be married. At the meeting, petitioner refused for some unknown reason to sign a prenuptial agreement and the engagement to Gilmartin was broken, the wedding was permanently canceled and petitioner and Gilmartin no longer speak. The petitioner insisted that the Diners Club bill be paid. Gilmartin then gave Anderson the bill and $1,761.68 in cash in petitioner's presence and instructed him to pay the bill. Gilmartin then left the country and went to Japan.

When Anderson received the bill and the cash on February 28, 1987, there were still four days left within which he could pay the bill before the agency's deadline of March 2, 1987. However, he became ill with the flu and did not pay the bill with a cashier's check until March 11, 1987, nine days after the deadline. This is confirmed by a letter from Anderson in the record. Petitioner delivered the canceled cashier's check to the agency on March 11, 1987, whereupon, as stated above, the agency canceled the indebtedness charge.

We have belabored the facts in great detail in this bizarre story to show that the petitioner never at any time refused to obey the agency's order to produce documentary proof of the payment of the Diners Club bill, but at all times tried to obey the order and in fact finally did so, although a few days late.

Under the foregoing facts, the finding of the board that petitioner was guilty of insubordination is not supported by substantial evidence and is an abuse of discretion on the part of the board. We set aside and hold unlawful the insubordination finding, action and conclusions of the board, as we are required to do by 5 U.S.C. § 7703(c).

Since petitioner was not guilty of insubordination and the indebtedness charge was dismissed by the agency, we do not consider the question of nexus raised by the agency and the board, because nexus is not applicable to nor connected with any issue in the case.

■ The petitioner has been punished by the reprimand order that was issued to her on the indebtedness charge before it was dismissed. It was authorized by the contract between the agency and Diners Club and by the agreement petitioner signed when she applied for the Diners Club card. It was also authorized by GSA regulation 41 C.F.R. § 105–735.210 quoted above, requiring personnel to pay their just financial obligations in a proper and timely manner. Supervisors are authorized by 41 C.F.R. § 105–735.103(c)(2) to:

.    .    .    .    .

[T]ake or recommend disciplinary or remedial action in the case of those who violate the standards or related laws and regulations.

This reprimand was issued because petitioner failed to pay her Diners Club card indebtedness in a proper and timely manner and allowed it to become delinquent for 120 days. Under these circumstances, the reprimand was proper and justified. It will remain in her personnel file for three years.

We reverse the board and instruct it to direct the agency to cancel the 60–day suspension without pay and the reduction in grade of petitioner, and to restore petitioner to her former GS–13 position, with back pay and other benefits to which she is entitled.

*REVERSED*