Nevin L. **RUPERT**

v.

Pete **GEREN**.

Civil Action No. CCB–08–1518.

United States District Court, D. Maryland.

March 31, 2009.

Jennifer L. Stair, John M. Singleton, Singleton Gendler and Terrasa, Owings Mills, MD, for Nevin L. Rupert.

Thomas H. Barnard, Office of the U.S. Attorney, Baltimore, MD, for Pete Geren.

## MEMORANDUM

CATHERINE C. BLAKE, District Judge.

Now pending before the court is a motion to dismiss or, in the alternative, for summary judgment, filed by defendant Pete Geren, Secretary of the U.S. Department of the Army ("Army"), against plaintiff Nevin L. Rupert. Mr. Rupert is appealing a decision of the Merit Systems Protection Board ("MSPB") sustaining the Army's decision to remove him from his position at the U.S. Army Research Laboratory ("ARL"), claiming that the MSPB's decision was arbitrary and capricious and amounts to harmful procedural error (Counts I & IV). He is also suing Mr. Geren, as head of the Army, for allegedly discriminating against him on the basis of his age and in retaliation for his filing a charge with the Equal Employment Opportunity Commission ("EEOC"), in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq. (Count II); and in retaliation for his participation in a Department of Justice ("DOJ") investigation (Count III). The issues in this case have been fully briefed and no hearing is necessary. For the reasons stated below, defendant's motion, construed as a motion for summary judgment, shall be granted.[1]

## BACKGROUND

Mr. Rupert began employment with the Army on April 7, 1974, as a mechanical engineer, eventually taking a position at ARL, located at Maryland's Aberdeen Proving Ground, where he researched body armor technology for ARL's Weapons and Materials Research Directorate ("ARL/WMRD"). By 1998, Mr. Rupert had filed several complaints with the EEOC. A settlement agreement with ARL was reached in September 1998, under which ARL agreed to revise certain of his

1. Also pending is a motion by Mr. Rupert for limited discovery "relating to his EEO claims, the actions of [ARL's counsel] Ken Spitza and Colonel Norwood." (Pl.'s Opp. at 1.) Because Mr. Rupert has failed to file a Rule 56(f) affidavit detailing the reasons additional discovery is needed, this motion will be denied. See Fed.R.Civ.P. 56(f); Nguyen v. CNA Corp., 44 F.3d 234, 242 (4th Cir.1995) (affidavit required for additional discovery to be permitted).

performance appraisals[2] and give him a pay raise.[3] In return, Mr. Rupert agreed to withdraw his pending complaints, and to "keep his Supervisor fully informed of his activities and include him in advance on decisions related to program plans, schedules, objectives and expenditure of Government resources." (Def.'s Mot. at Ex. D, Settlement Agreement Tr. at 5.) He also agreed to "not transmit information related to Government projects without prior approval of his Supervisors."[4] (Id.)

Beginning in 2005, a series of exchanges occurred involving Mr. Rupert and his supervisor, Dr. Scott Schoenfeld, that ultimately resulted in Mr. Rupert's removal from the Army. In September 2005, Mr. Rupert submitted his list of accomplishments for his annual performance appraisal. In this list, Mr. Rupert stated that he and colleague Richard Bruno were favorably cited by name in Public Law 109–13 for their work developing limb protection technology. Such a citation would warrant a monetary reward under the ARL performance appraisal system. However, when Dr. Schoenfeld checked to see if Mr. Rupert was named in this law, which had been enacted on May 11, 2005, he found no reference to Mr. Rupert. When he then asked Mr. Rupert about the matter, Mr. Rupert gave him no explanation, "so I assumed that he was lying" about the accomplishment. (Hearing Tr. at 224.)

In October 2005 another exchange occurred that troubled Dr. Schoenfeld. Mr. Rupert had been reassigned during the summer of 2005 from two different body armor projects—one with a company called Pinnacle Armor and one with a company called QuadGard—due to lack of mission funding for his support of those projects.[5] Mr. Rupert had been ARL's point of contact ("POC") for the U.S. Navy ("Navy") on the QuadGard project, and when they learned about his reassignment, they objected. As a result, Jill Smith, Director of ARL/WMRD, and John Miller, Director of ARL, had agreed to allow him to continue as their POC on that project. In October, when a shipment of body armor specimens from Pinnacle Armor arrived at ARL related to one of the projects Dr. Schoenfeld thought was de-funded, he emailed Mr. Rupert and asked him why ARL had received them. Mr. Rupert responded that ARL was testing them, that he was the Contracting Officer's Representative ("COR") on the Pinnacle Armor contract with ARL, and that Ms. Smith, "when [she] agreed to reinstate [him] to the body armor programs," had indicated to him that his role in the testing was being funded with mission funding. (Def.'s Mot. at Ex. J, Oct. Email Exchange at 2.) When Dr. Schoenfeld then checked this explanation with Ms. Smith, she told him that, while she had allowed Mr. Rupert to remain the POC on the Navy's customer-funded body armor program (QuadGard),

---

**2.** The ARL performance appraisal system is essentially a pay-for-performance system, linking pay increases and bonuses to employees' self-reporting of their accomplishments during the previous appraisal period.

**3.** ARL, in reaching this settlement, was represented by its counsel Mr. Kenneth Spitza.

**4.** Mr. Rupert filed another complaint with the EEOC in March of 2004, alleging that the Army was not fully meeting its obligations under the 1998 settlement agreement, but this

matter resolved itself when those obligations began to be fully met. (Hearing Tr. at 456.)

**5.** Mission funding is one of two possible funding types for ARL projects. Mission funding comes from the Army itself, through one of its offices, e.g., the Office of the Secretary of Defense. The other type of funding is customer funding, which comes from other branches of the military, other government organizations, and private industry.

this role was not being supported with mission funding, and she furthermore said that she had not reinstated him to body armor programs generally. (*Id.* at 1–2.)

On January 18, 2006, Dr. Schoenfeld attended a meeting on Capitol Hill, hosted by Murray Neal, president of U.S. Armoring. At the meeting, Mr. Neal disseminated a bound PowerPoint presentation that bore ARL logos and contained several mentions of Mr. Rupert. Because the PowerPoint presentation was stamped "Pinnacle Armor Proprietary," Dr. Schoenfeld, upon returning from the meeting, asked Mr. Rupert for a copy of the ARL Form 1 [6] for the presentation. Mr. Rupert responded that maintenance of the ARL Form 1 for that presentation was not his responsibility and that Dr. Schoenfeld should "call Kay [Sprenkle]," Dr. Schoenfeld's secretary, for a copy. (Def.'s Mot. at Ex. M, Jan. Email Exchange at 2.) Dr. Schoenfeld replied that it was in fact Mr. Rupert's responsibility to maintain such forms, and that, "[i]f you can not show it to me then I will assume it does not exist." (*Id.*)

Soon after, on February 1, 2006, Mr. Rupert sent an email to personnel at the Office of the Secretary of Defense ("OSD") and the Aberdeen Test Center ("ATC"), including Mr. Tracy Sheppard from OSD and Col. John Rooney from ATC, stating that Dr. Schoenfeld would like a POC at the OSD's office of the Director of Operational Test and Evaluation ("DOT & E") on its offer to support Pinnacle Armor testing. In that email, he also stated that colleague Dr. Frank Paragallo had informed him that Dr. Schoenfeld had briefed senior ARL management and had stated that *"ARL/WMRD does not approve of OSD/DOT & E recommended test procedures as practiced at ATC's Light Armor Range for the evaluation of body armor."* (Def.'s Mot. at Ex. N, Feb. Email Exchange at 5–6 (emphasis in original).) He further warned that this disapproval of testing procedures "may prevent the transfer of targets to ATC for this evaluation," since Mr. Rupert worked for ARL. (*Id.* at 6.) Mr. Sheppard replied that he was the POC and that OSD/DOT & E had not recommended any specific test procedures, and demanded to know where the boldface statement had originated. Dr. Schoenfeld promptly responded to all parties with this email directed at Mr. Rupert:

> Nevin—
>
> Your statement is absolutely not true.
>
> It is not even close to an actual quote.
>
> It is *your* practice and execution of program completely outside of ARL standards for vetting of information and data that I do not approve of.
>
> Scott

(*Id.* at 4 (emphasis in original).) This email was preceded by an in-person visit, in which Dr. Schoenfeld admonished Mr. Rupert for making a false statement and told him to correct it. (Hearing Tr. at 242 & 254.) Mr. Paragallo later responded to the email as well, writing: "Nevin—I did not state that WMRD disapproved of ATC procedures but that WMRD felt that the ballistic testing was not the only criteria that should be considered in a procurement buy.—Frank." (Def.'s Mot. at Ex. N, Feb. Email Exchange at 3.)

The following day, despite the replies and admonishment, Mr. Rupert responded to an emailed question from Col. Rooney about whether money would indeed be transferred to ATC for certain testing op-

---

**6.** The ARL Form 1 is a form that ARL personnel fill out to authorize the public release of otherwise proprietary information.

erations, given Dr. Schoenfeld's indication that ARL did not disapprove of ATC's test procedures. In his reply, Mr. Rupert reiterated that he "was told that ARL/WMRD does not approve of your testing procedures," and then said that, despite this apparent disapproval by ARL/WMRD, the money for the testing "is on the way, because I support your test methods." (Def.'s Mot. at Ex. N, Feb. Email Exchange at 1.)

All of the above email exchanges formed part of the basis for an Advance Notice of Proposed Removal ("Notice"), which Mr. Rupert received on August 23, 2006. In the Notice, prepared by Dr. Schoenfeld, Mr. Rupert was informed that his removal from the Army was being proposed because he allegedly: (a) made a false statement about his accomplishments in fiscal year 2005, namely the citation in Public Law 109–13, and then failed to comply with Dr. Schoenfeld's request for an explanation regarding its falsity; (b) misrepresented his responsibilities with regard to Pinnacle Armor and related funding in October of 2005; (c) made unauthorized and false statements outside of ARL regarding ARL's view on ATC body armor testing procedures and then continued to make them after being told not to; (d) disseminated a proprietary PowerPoint presentation without complying with ARL regulations regarding releases; and (e) gave false statements during a separate Department of Justice investigation in April 2006. (Def.'s Mot. at Ex. O, Notice at 1–4.) These five reasons gave rise to five specific offenses: (1) "insubordination" (under (a)

and (c)); (2) "failure to follow verbal and written regulations/rules/ policies/procedures" (under (d)); (3) "discourtesy towards management officials/co-workers" (apparently under (a) through (d)); (4) "refusal to testify, interference or obstructing an investigation" (under (e)); and (5) "false statements" (under (a) through (d)). (Id. at 1.) Most of these offenses are punishable by removal after the first offense.[7] (See Def.'s Mot. at Ex. X.)

Mr. Rupert submitted a written response to the Notice on September 15, 2006, and also filed a new EEOC complaint on October 6, 2006, claiming that the Notice constituted both retaliation for his prior EEOC activity from 1998 through 2004 and age discrimination against him as a 54–year–old man. (Pl.'s Opp. at Ex. 2.) Colonel James Althouse, Military Deputy for ARL/WMRD, was tasked with reviewing the Notice, and on February 21, 2007, he issued a memorandum decision ("Removal Decision") in which he dismissed the charges against Mr. Rupert for discourtesy and refusal to testify, but sustained all of the remaining charges. He found these remaining charges to be supported by the evidence, and further opined that "[t]hese blatant violations were intentional[ ] [and] undermined authority." (Def.'s Mot. at Ex. Q.) Accordingly, he found that removal was appropriate and would promote the efficiency of the service.[8] Mr. Rupert was then removed from service and entered retirement.

Mr. Rupert filed an appeal of the Removal Decision to the U.S. Merit Systems Protection Board ("MSPB") on March 23,

---

**7.** Failure to follow verbal and written regulations/rules/policies/procedures is only punishable by removal after the third offense, and discourtesy is only punishable by removal after the fourth offense. (Def.'s Mot. at Ex. X.)

**8.** A federal agency may take disciplinary actions such as removal "against an employee

only for such cause as will promote the efficiency of the service." 5 U.S.C. § 7513(a); see 5 U.S.C. § 7512(1) (listing "removal" as one of the forms of discipline covered by § 7513). The "efficiency of the service" refers to "the efficiency of the public service as a whole." 15A Am.Jur.2d Civil Serv. § 71.

2007, in which he claimed that "[t]he charges and ultimate decision were in retaliation for prior EEO activity and for opinions about testing methodology, professional ethics, and the definition of the organization's ultimate customer." (Def.'s Mot. at Ex. R.) He also claimed that the Removal Decision was reached in a manner violative of due process. A two-day video hearing was then conducted before the MSPB on August 13–14, 2007, in which Mr. Rupert and all other relevant witnesses testified, and soon thereafter, in September 2007, Mr. Rupert filed another charge of employment discrimination with the EEOC.

On April 7, 2008, Administrative Judge ("AJ") Wilhelmina Douglas Stevenson issued her Initial Decision on this matter, and found that ARL had put forward sufficient evidence to support its insubordination and false statement charges, but not its charge of failure to follow verbal and written regulations/rules/policies/procedures. She further found that Mr. Rupert was not denied due process by the Removal Decision, that the Removal Decision did not constitute discriminatory retaliation, and that removal was a reasonable penalty that would promote the efficiency of the service. Accordingly, Mr. Rupert's removal was affirmed. The decision became final on May 12, 2008, and on June 11, Mr. Rupert filed this appeal.[9]

### STANDARD OF REVIEW

Appeals from MSPB actions are ordinarily heard in the Court of Appeals for the Federal Circuit. 5 U.S.C. § 7703(b)(1). When an appeal from the MSPB involves both nondiscrimination claims and Title VII discrimination claims, however, that appeal may be heard in the appropriate U.S. district court. 5 U.S.C. § 7703(b)(2); 42 U.S.C. § 2000e–5(f)(1); see 29 C.F.R. § 1614.302(a)(2) (describing "mixed case appeals"); Hooven–Lewis v. Caldera, 249 F.3d 259, 265–66 (4th Cir.2001). In such a case, the district court reviews the discrimination claims de novo and the nondiscrimination claims under an "arbitrary and capricious" standard. 5 U.S.C. § 7703(c). Specifically, with nondiscrimination claims the district court reviews the administrative record to determine whether the MSPB's actions, findings, or conclusions are: "(1) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (2) obtained without procedures required by law, rule, or regulation having been followed; or (3) unsupported by substantial evidence." (Id.) "Substantial evidence" in this context means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Frederick v. Dep't of Justice, 73 F.3d 349, 352 (Fed.Cir.1996) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938)). The burden is on the appellant to prove arbitrariness or capriciousness, procedural impropriety, or lack of substantial evidence. Harris v. Dep't of Vet. Aff., 142 F.3d 1463, 1467 (Fed.Cir. 1998).

This review comes before the court on a motion for summary judgment. Where matters outside the pleadings are considered by the court, a defendant's motion to dismiss will be treated as one for summary

---

**9.** In the complaint in this case, filed by the same counsel that represented Mr. Rupert in the proceedings below, no mention is made of the previously alleged age discrimination. Furthermore, no notice of intent to sue for age discrimination was provided to the EEOC, as required, until twelve months after the six-month statute of limitations for such a claim had run. See 29 U.S.C. § 633a(d). Accordingly, this claim is not properly before the court. See Bradley v. Kissinger, 418 F.Supp. 64, 66 (D.D.C.1976).

judgment under Rule 56. *See* Fed. R.Civ.P. 12(b) & (c); *Gay v. Wall,* 761 F.2d 175, 177 (4th Cir.1985). Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment:

> should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.

Fed.R.Civ.P. 56(c). The Supreme Court has clarified this does not mean that any factual dispute will defeat the motion:

> By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (emphasis in original).

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc.,* 346 F.3d 514, 525 (4th Cir.2003) (alteration in original) (quoting Fed.R.Civ.P. 56(e)). The court must "view the evidence in the light most favorable to ... the nonmovant, and draw all reasonable inferences in her favor without weighing the evidence or assessing the witness' credibility," *Dennis v. Columbia Colleton Med. Ctr., Inc.,* 290 F.3d 639, 644–45 (4th Cir.2002), but the court also must abide by the "affirmative obligation of the trial judge to prevent factually unsupported claims and defenses from proceeding to trial." *Bouchat,* 346 F.3d at 526 (internal quotation marks omitted) (quoting *Drewitt v. Pratt,* 999

F.2d 774, 778–79 (4th Cir.1993), and citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

## ANALYSIS

### A. Discrimination Claims under Title VII

█ Mr. Rupert asserts that his removal from the Army constituted retaliation, in violation of Title VII, both for his participation in a DOJ body armor investigation, and for his past EEOC complaints. Because no direct evidence of retaliation has been presented, Mr. Rupert's retaliation claims are analyzed under the three-pronged burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, a plaintiff alleging Title VII discrimination must first make out a *prima facie* case of that discrimination. If he succeeds in carrying this initial burden, then "the burden shifts to the employer ... 'to articulate a legitimate, nondiscriminatory reason for the adverse employment action.'" *Lettieri v. Equant Inc.,* 478 F.3d 640, 646 (4th Cir.2007) (quoting *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 285 (4th Cir.2004) (en banc)). Once such a reason is provided, the burden shifts back to the plaintiff to demonstrate that the given reason was a pretext for unlawful discrimination. *Id.*

█ In order to make out a *prima facie* case of retaliation, the plaintiff must demonstrate that: (1) he engaged in a protected activity; (2) the employer acted adversely against him; and (3) the protected activity and the adverse action were causally connected. *Holland v. Washington Homes, Inc.,* 487 F.3d 208, 218 (4th Cir.2007). It is undisputed that removal is a materially adverse employment action. *See Dowe v. Total Action Against Poverty*

*in Roanoke Valley,* 145 F.3d 653, 656–657 (4th Cir.1998) (citing *Hartsell v. Duplex Products, Inc.,* 123 F.3d 766, 775 (4th Cir. 1997) for the proposition that termination is an adverse employment action); *cf. Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68–70, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (clarifying that many actions which fall short of removal may constitute adverse employment actions as well); *Darveau v. Detecon, Inc.,* 515 F.3d 334, 342 (4th Cir.2008) (citing *Burlington* for the proposition that "a title VII retaliation plaintiff need not allege or prove an ultimate adverse employment action"). Therefore, what must be determined here is whether Mr. Rupert's activities were protected and whether they were causally connected to his removal.

■■■ While it is clear that complaining to the EEOC is a protected activity, *see Price v. Thompson,* 380 F.3d 209, 212 (4th Cir.2004), it is equally clear that participating in a DOJ investigation of matters unrelated to employment is not. *See Crowley v. Prince George's County,* 890 F.2d 683, 687 (4th Cir.1989). Mr. Rupert concedes this fact in his opposition. (Pl.'s Opp. at 4.) Accordingly, he has failed to make out a *prima facie* case of retaliation related to his involvement in the DOJ investigation.

■■■ With regard to his claim of retaliation for his multiple EEOC complaints, Mr. Rupert has failed to establish that his removal was causally connected to these complaints. The specific complaints involved in this claim appear to be the complaints leading to his 1998 settlement agreement (*see* Compl. ¶¶ 2, 12, & 13); no

mention is made anywhere in Mr. Rupert's complaint of his 2004 EEOC complaint.[10] To prove a causal connection between these complaints and his removal, Mr. Rupert "must be able to show that [the defendant] fired him '*because* the plaintiff engaged in a protected activity.'" *Holland,* 487 F.3d at 218 (quoting *Dowe,* 145 F.3d at 653) (emphasis in original). The fact that Mr. Rupert's removal followed his EEOC complaints is not enough to make this showing; to be treated as indirect proof of causation, the temporal proximity between the protected activity and the adverse employment action must be close. *See Clark County School Dist. v. Breeden,* 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001). "A lengthy time lapse between the employer becoming aware of the protected activity and the alleged adverse employment action … negates any inference that a causal connection exists between the two." *Dowe,* 145 F.3d at 657. Given that the time lapse in this case is approximately nine years, this court cannot infer a causal connection based on temporal proximity.

■■■ Furthermore, neither the Notice nor the Removal Decision give any indication that Mr. Rupert's removal was based on his earlier EEOC complaints. While it is true that the Notice prepared by Dr. Schoenfeld includes a statement about the 1998 EEOC settlement agreement, this one-paragraph statement appears after four pages of allegations of misconduct, and only serves to underscore the impropriety of Mr. Rupert's alleged offenses[11]; it in no way suggests—even indirectly—

---

**10.** Mr. Rupert's 2006 EEOC complaint is neither in his complaint here nor exhausted. Accordingly, it will not be considered. *See Riley v. Technical & Mgmt. Servs. Corp., Inc.,* 872 F.Supp. 1454, 1459 (D.Md.1995).

**11.** Specifically, this paragraph highlights that Mr. Rupert's alleged offenses constituted a

breach of his EEOC settlement agreement obligations, namely keeping his supervisor fully informed of his activities and not transmitting information related to government projects without his supervisor's approval. (*See* Def.'s Mot. at Ex. D, Settlement Agreement Tr. at 5.)

that Mr. Rupert's removal was being proposed because he had engaged in EEOC activity. (Def.'s Mot. at Ex. O, Notice at 5.) Col. Althouse's eventual decision to approve removal was based entirely on the several allegations of misconduct; no reference was made to Mr. Rupert's prior EEOC activity. (Def.'s Mot. at Ex. Q.) Mr. Rupert has thus failed to show that his prior EEOC activity and his removal were causally connected, and so has not made out a *prima facie* case of retaliation.

[11] Even if a *prima facie* case is assumed, the Army has articulated legitimate, nondiscriminatory reasons for Mr. Rupert's removal that he cannot show to be pretextual. As reflected in the Notice and the Removal Decision, Mr. Rupert was insubordinate on at least two occasions and made false statements on numerous occasions. Each of these offenses is itself grounds for removal (Def.'s Mot. at Ex. X), and even if they were based on misunderstandings, as Mr. Rupert strongly argues, he has failed to demonstrate that they were not the true bases for his removal.[12] Mr. Rupert suggests that pretext can be discerned from the timing of his proposed removal in relation to a February 17, 2006, email request made by Colonel John Norwood to remove him from a body armor contract with a company that Col. Norwood allegedly viewed as a competitor. (Pl.'s Opp. at Ex. 5; *see* Compl. ¶¶ 17–19.) This lone email, addressed to Jill Smith and not to Dr. Schoenfeld or Col. Althouse, was sent six months before Dr. Schoenfeld proposed Mr. Rupert's removal, and nearly a year before Col. Althouse ultimately approved the removal. Even assuming these men were aware of this email, there is simply no evidence that it was used to

help conceal an alleged plan, enacted months later, to remove Mr. Rupert in retaliation for past EEOC complaints.

For all of the above reasons, summary judgment is warranted as to Mr. Rupert's claim of retaliation for prior EEOC activity.

### B. Nondiscrimination Claims

Mr. Rupert also claims that the decision by the MSPB was arbitrary and capricious, and that its findings amount to harmful procedural error. As stated above, Mr. Rupert's nondiscrimination claims are reviewed under an "arbitrary and capricious" standard. 5 U.S.C. § 7703(c).

#### i. Arbitrary & Capricious Decision to Remove on the Merits (Count I)

Mr. Rupert specifically claims that it was arbitrary and capricious for AJ Stevenson to find that: (1) he made false statements, (2) he was insubordinate, (3) his removal advanced the efficiency of the service, and (4) his removal was a reasonable penalty. (*See* Compl. ¶¶ 19–33.) These findings will be addressed in turn.

#### 1. False Statements

■■■ AJ Stevenson found that Mr. Rupert made false statements on four occasions: when he named as an accomplishment a non-existent citation to himself in Public Law 109–13; when he suggested that he had been reinstated to body armor programs and was being supported by mission funding; when he told personnel at OSD and ATC that ARL did not approve of OSD/DOT & E test procedures; and when he said that he did not disseminate a proprietary PowerPoint presenta-

---

**12.** The court recognizes that there may have been ill will between Mr. Rupert and Dr. Schoenfeld prior to Dr. Schoenfeld recommending his removal. However, ill will is not itself an indication of discriminatory pretext. *See, e.g., Hooven–Lewis,* 249 F.3d at 274 ("Personality conflicts are not actionable as retaliation.").

tion and did not have the release form for it. (Def.'s Mot. at Ex. S, Initial Decision at 6–9.) Mr. Rupert claims these findings were arbitrary and capricious because they failed to take into account the totality of the circumstances, as the law requires. (Pl.'s Opp. at 10.)

 In finding that Mr. Rupert made false statements on each of these occasions, AJ Stevenson relied on her examination of the evidence, supplemented by two days of hearings, as well as her review of the case law. Her carefully explained findings are consistent with this court's reading of the record and legal precedent. To sustain a charge of false statements in this context, the agency must find, by a preponderance of the evidence, that the accused employee "knowingly supplied wrong information, and that he did so with the intention of defrauding the agency." *Naekel v. Dep't of Transp.*, 782 F.2d 975, 977 (Fed.Cir.1986). Because there is rarely direct evidence of intent, the MSPB is to examine the totality of the circumstances before making an intent determination. *Suarez v. Dep't of Housing & Urban Dev.*, 96 M.S.P.R. 213, 227 (M.S.P.B.2004).[13] In some cases, "[a]n incorrect statement coupled with the lack of any credible explanation or contrary action by an employee can constitute circumstantial evidence of intent to deceive." *Id.* AJ Stevenson found, based on her review of the evidence and hearing testimony, that

Mr. Rupert had made incorrect statements on all four occasions and had not offered credible explanations for them. I have no reason to question AJ Stevenson's assessment of Mr. Rupert's credibility, *see Bieber v. Dep't of Army*, 287 F.3d 1358, 1364 (Fed.Cir.2002) (MSPB credibility determinations are "virtually unreviewable on appeal"), and while I do not entirely share her interpretation of Mr. Rupert's disputed statements,[14] I cannot deem her findings of false statements to be arbitrary and capricious. *Cf. Bieber*, 287 F.3d at 1364 (it is "not our function" as a reviewing court to "re-weigh conflicting evidence").

### 2. Insubordination

 AJ Stevenson found that Mr. Rupert was insubordinate when he failed to comply with Dr. Schoenfeld's request for more information about his Public Law 109–13 citation, and when he failed to comply with Dr. Schoenfeld's order not to continue to communicate false information outside ARL about ARL's views on ATC body armor testing procedures by emailing Col. Rooney such information. (Def.'s Mot. at Ex. S, Initial Decision at 11–12.) Mr. Rupert claims he actually did comply with the request and the order, making these findings arbitrary and capricious. (Pl.'s Opp. at 17–18.)

 "Insubordination is 'a willful and intentional refusal to obey an authorized

---

**13.** Reported decisions of the MSPB, while not binding on this court, "may be relied upon for their persuasive authority." *Williams v. U.S. Merit Sys. Prot. Bd.*, 55 F.3d 917, 920 n. 3 (4th Cir.1995).

**14.** I do not share AJ Stevenson's certainty about the defendant's charge that Mr. Rupert made false statements about the dissemination of the proprietary PowerPoint presentation, particularly in light of Mr. Neal's later statement that Mr. Rupert was uninvolved in the dissemination of that presentation (Def.'s

Mot. at Ex. P, Neal Aff.), and Dr. Schoenfeld's later admission that it is likely Mr. Rupert was correct when he stated that Ms. Sprenkle had a copy of the release form. (Hearing Tr. at 258; *see id.* at 59–62 (Ms. Sprenkle testifying that she routinely made copies of ARL 1 forms and kept them on file).). Even if her finding on this statement was unsupported by the evidence, however, Mr. Rupert's three other false statements are each enough to warrant removal.

order of a superior officer which the officer is entitled to have obeyed.'" *Bieber*, 287 F.3d at 1364 (quoting *Phillips v. Gen. Servs. Admin.*, 878 F.2d 370, 373 (Fed.Cir. 1989) (emphasis omitted)). With regard to Dr. Schoenfeld's request for more information regarding Mr. Rupert's alleged citation, AJ Stevenson acknowledged Mr. Rupert's claim that he did a Google search and contacted a colleague to learn more about the status of that citation, but also noted that he admitted not reporting these follow-up activities to Dr. Schoenfeld. AJ Stevenson's subsequent finding that Mr. Rupert's failure to provide Dr. Schoenfeld any further information constituted insubordination is not arbitrary and capricious. Likewise, the court cannot conclude that AJ Stevenson was arbitrary and capricious in finding Mr. Rupert's email to Col. Rooney of ATC to be insubordinate. After being admonished for stating in an email to ATC personnel that "ARL/WMRD does not approve of OSD/DOT & E recommended test procedures as practiced at ATC's Light Armor Range," and then told to correct the statement, he nevertheless sent Col. Rooney an email the next day in which he repeated the statement that "ARL/WMRD does not approve of your testing procedures." (Hearing Tr. at 254; Def.'s Mot. at Ex. N, Feb. Email Exchange at 1 & 6.) These actions demonstrate willful noncompliance with the directives of his superior.

### 3. Removal as Advancing Efficiency of the Service

■ The MSPB may sustain disciplinary actions such as removal where the employer has shown that "the grounds for the [disciplinary] action relate to either an employee's ability to accomplish his duties satisfactorily or to some other legitimate government interest." *Hatfield v. Dep't of Interior*, 28 M.S.P.R. 673, 675 (M.S.P.B. 1985). Mr. Rupert disputes AJ Steven-

son's finding that the severe punishment of removal for false statements and insubordination promotes efficiency, and claims that AJ Stevenson "does not provide any rationale for why Removal is the appropriate discipline." (Compl. ¶ 29.)

■ A federal government agency may take disciplinary actions such as removal only when those actions promote the efficiency of the service. 5 U.S.C. § 7513(a). As AJ Stevenson explained, employees who make false statements impede the efficiency of the service by interfering with the employee-employer relationship. *See Wier v. Dep't of Army*, 54 M.S.P.R. 348, 354 (M.S.P.B.1992) ("falsification ... impeaches the employee's reliability, veracity, trustworthiness, and ethical conduct"). Furthermore, AJ Stevenson rightly pointed out that failing to obey supervisors' orders "seriously impairs the working relationship between employees and supervisors" and warrants serious discipline like removal. (Def.'s Mot. at Ex. S, Initial Decision at 14.) *See Webster v. Dep't of Army*, 911 F.2d 679, 688 (Fed.Cir.1990). Therefore, AJ Stevenson provided a sound rationale for why removal for false statements and insubordination would promote efficiency of service; I cannot find her conclusion to be arbitrary and capricious.

### 4. Removal as Reasonable Penalty

■ According to *Douglas v. Veterans Admin.*, 5 MSPB 313, 5 M.S.P.R. 280 (1981), the MSPB must weigh several factors and explain the weight given to each in explaining why it finds a particular penalty for misconduct to be appropriate and reasonable. 5 M.S.P.R. at 304–06; *see Webster*, 911 F.2d at 686 (discussing the *Douglas* analysis). Mr. Rupert claims that AJ Stevenson's finding that removal was reasonable for his alleged offenses was arbitrary and capricious, as it was based only on her findings that Mr. Rupert com-

mitted those offenses, and not on other *Douglas* factors such as the nature of those offenses. *Id.* at 305 (listing as a factor "the nature and seriousness of the offense"). (*See* Compl. ¶ 32.) This court's review of penalty determinations is narrow; the given penalty will not be overturned unless it is "totally unwarranted or grossly disproportionate to the misconduct." *Mazares v. Dep't Of Navy,* 302 F.3d 1382, 1386 (Fed.Cir.2002).

■ Contrary to Mr. Rupert's description, AJ Stevenson weighed several *Douglas* factors before determining that removal was indeed a reasonable penalty.[15] Based on her examination of these factors, Col. Althouse's testimony at the administrative hearing on these factors, and her review of the case law, she found removal to be a reasonable penalty for Mr. Rupert's offenses. Her decision is well supported by relevant precedent, and will be upheld. *See, e.g., Mazares,* 302 F.3d at 1386 (affirming MSPB decision to uphold removal penalty for insubordination); *Kumferman v. Dep't of Navy,* 785 F.2d 286, 291–92 (Fed.Cir.1986) (affirming MSPB decision to uphold removal penalty for false statements on agency documents).

### ii. Harmful Procedural Error (Count IV)

Finally, Mr. Rupert claims that some of AJ Stevenson's actions constitute harmful procedural error. Specifically, he claims it was harmful error for AJ Stevenson to: (1) find that Col. Althouse's *ex parte* discussions with ARL counsel did not create a procedural defect in his initial removal, in violation of due process; (2) partially deny his motion to compel production of certain

ARL documents; and (3) fail to disqualify Mr. Spitza—whom he alleges is biased against him—as ARL's attorney at the administrative hearing. (*See* Compl. ¶¶ 46–57.) These claims will be addressed in turn.

Adverse decisions such as removal may not be sustained against an employee if the employee can show "harmful error in the application of the agency's procedures in arriving at such decision." 5 U.S.C. § 7701(c)(2)(A). Mr. Rupert is required to prove any such claim by a preponderance of the evidence. 5 C.F.R. § 1201.56(a)(2)(iii) ("The appellant has the burden of proof, by a preponderance of the evidence, with respect to ... [a]ffirmative defenses"); *see id.* § 1201.56(b)(1) (listing as an affirmative defense a showing of "harmful error in the application of the agency's procedures in arriving at its decision"). Harmful error in this context means "[e]rror by the agency in the application of its procedures that is likely to have caused the agency to reach a conclusion different from the one it would have reached in the absence or cure of the error." 5 C.F.R. § 1201.56(c)(3). Therefore, to succeed on his harmful error claims here, Mr. Rupert must prove by a preponderance of the evidence that the alleged errors caused the AJ to reach a different conclusion than she otherwise would have. *See Pinegar v. Fed. Election Comm'n,* 105 M.S.P.R. 677, 697 (M.S.P.B. 2007).

### 1. Harmful Error from Alleged Ex Parte Communications

Mr. Rupert claims that *ex parte* communications among Col. Althouse, Dr. Scho-

---

**15.** Specifically, she weighed:

the nature and seriousness of the offense, the appellant's past work record, including length of service, the clarity with which the appellant was on notice of any rules that were violated in committing the offense or

had been warned about the conduct in question, the supervisor's confidence in the employee, and mitigating circumstances surrounding the offense.

(Def.'s Mot. at Ex. S, Initial Decision at 23 (citing *Douglas,* 5 M.S.P.R. at 305).)

enfeld, and ARL's counsel Mr. Spitza denied him due process because he was not able to participate in them and because they biased Col. Althouse against him, ultimately affecting Col. Althouse's Removal Decision. (Pl.'s Opp. at 5–7.) Mr. Rupert therefore argues that AJ Stevenson's failure to identify these *ex parte* communications as a denial of due process constitutes harmful error. (Compl. ¶ 50.)

■■■■ As an initial matter, due process does not require a reviewing official in an agency employment proceeding to allow the affected employee to participate in every communication related to his or her review. Rather, due process only requires that the employee receive notice—in the form of an explanation of the employer's evidence—and have an opportunity to be heard as to his version of events. *See Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Barresi v. U.S. Postal Serv.,* 65 M.S.P.R. 656, 666 (1994). It is true that certain *ex parte* communications, such as those involving decision recommendations made by an adversary directly to the decision maker, may be viewed as a denial of due process. *See Sullivan v. Dept. of Navy,* 720 F.2d 1266, 1271–74 (Fed.Cir. 1983). As the Federal Circuit Court of Appeals has explained, however: "not every *ex parte* communication is a procedural defect so substantial and so likely to cause prejudice that it undermines the due process guarantee. . . . Only *ex parte* communications that introduce new and material information to the deciding official will violate the due process guarantee of notice." *Stone v. F.D.I.C.,* 179 F.3d 1368, 1376–77 (Fed.Cir.1999). In determining whether *ex parte* communications introduced "new and material information," the reviewing court should consider the following factors:

whether the *ex parte* communication merely introduces "cumulative" informa-

tion or new information; whether the employee knew of the error and had a chance to respond to it; and whether the *ex parte* communications were of the type likely to result in undue pressure upon the deciding official to rule in a particular manner.

*Id.* at 1377.

■■■■ The AJ here explicitly analyzed the evidence before her using the *Stone* factors, and concluded that no new information was introduced to Col. Althouse through his communications with Dr. Schoenfeld and Mr. Spitza, and further that these communications did not result in undue pressure upon Col. Althouse to decide in favor of removal. (*See* Def.'s Mot. at Ex. S, Initial Decision at 16–18.) She noted that Col. Althouse stated under oath that he was not at all influenced in his decision by any communications with Dr. Schoenfeld (*id.* at 17, citing Hearing Tr. at 187), and Mr. Rupert has failed to show otherwise. Nor has he shown that Col. Althouse would have reached a different conclusion—i.e., find removal unwarranted—if he had not engaged in these *ex parte* communications. *Cf. Andersen v. Dep't of State,* 27 M.S.P.R. 344, 349 (M.S.P.B.1985) (harmful error will not be found from *ex parte* communications unless plaintiff shows that new information introduced through them "likely had a harmful effect upon the outcome before the agency"). It was therefore not harmful error for AJ Stevenson to conclude that these communications did not deprive Mr. Rupert of his due process rights. *See Chambers v. Dep't of Interior,* 515 F.3d 1362, 1370 (Fed.Cir. 2008) (finding no due process violation from *ex parte* contacts).

### 2. *Harmful Error from Partial Denial of Motion to Compel*

■■■■ Mr. Rupert next claims that AJ Stevenson's partial denial of his July

10, 2007 motion to compel production of a wide array of documents was harmful error. Administrative judges at the MSPB have broad discretion in ruling on discovery matters, and their rulings are not to be overturned unless they constitute a "clear and ... harmful" abuse of discretion. *Chambers*, 515 F.3d at 1371 (quoting *Curtin v. Office of Pers. Mgmt.*, 846 F.2d 1373, 1378 (Fed.Cir.1988)). Absent "clear and harmful" abuse or "exceptional circumstances," in reviewing an administrative judge's discovery decision for abuse of discretion, "[w]e do not decide what this court would have done on the discovery issue had it been trying the case" or otherwise "second-guess the trial tribunal." *Spezzaferro v. Fed. Aviation Admin.*, 807 F.2d 169, 173 (Fed.Cir.1986).

Here, AJ Stevenson exercised her discretion by granting in part and denying in part Mr. Rupert's motion to compel, and Mr. Rupert submitted no objections to her ruling at the time. In raising the issue now, he makes no claim as to why this partial denial was harmful other than to say that he "was entitled to these documents to properly defend the allegations against him and to support his claim that his supervisor was unfairly targeting him." (Compl. ¶ 54.) This broad statement does not in any way explain how AJ Stevenson's ruling was a clear and harmful abuse of discretion, nor does it show how the partial denial caused AJ Stevenson to reach a different conclusion regarding removal than she otherwise would have. Accordingly, there is no harmful error here. *See Barrett v. Social Sec. Admin.*, 309 F.3d 781, 786–87 (Fed.Cir.2002).

### 3. Harmful Error from Failure to Disqualify Mr. Spitza

Mr. Rupert lastly asserts that it was harmful error for AJ Stevenson to fail to disqualify Mr. Spitza, given that he had been involved in previous interactions with Mr. Rupert that are at issue in this case— such as the representation of ARL in the negotiation of the 1998 EEOC settlement a agreement and the processes leading to Mr. Rupert's removal—and was therefore biased. (*See* Compl. ¶¶ 2 & 55–56.) Because Mr. Rupert did not move for Mr. Spitza's disqualification at his administrative hearing before the MSPB, it will not be considered by this court. *See Bosley v. Merit Sys. Prot. Bd.*, 162 F.3d 665, 668 (Fed.Cir.1998). Regardless, Mr. Rupert has failed to show how AJ Stevenson's failure to disqualify Mr. Spitza caused her to reach a conclusion different from one she would have reached had he been disqualified. Accordingly, this court finds no harmful error from Mr. Spitza's involvement in the administrative proceedings.

### CONCLUSION

For the foregoing reasons, defendant Army's motion, construed as a motion for summary judgment, will be granted. A separate Order follows.

### ORDER

For the reasons stated in the accompanying Memorandum, it is hereby **OR-DERED** that:

1. The defendant's motion to dismiss or, in the alternative, for summary judgment (docket entry no. 5) is construed as a motion for summary judgment and is **GRANTED;**

2. Judgment is entered in favor of the defendant; and

3. The Clerk shall **CLOSE** this case.